**SECURITIES AND EXCHANGE COMMISSION, Appellee,**

v.

**LIFE PARTNERS, INCORPORATED and Brian D. Pardo, Appellants.**

**Nos. 95–5364, 96–5018 and 96–5090.**

United States Court of Appeals, District of Columbia Circuit.

Argued April 4, 1996.

Decided July 5, 1996.

Thomas W. Kirby, Washington, DC, argued the cause for appellants, with whom Ida W. Draim was on the briefs.

Eric Summergrad, Assistant General Counsel, Securities & Exchange Commission, Washington, DC, argued the cause for appellee, with whom Richard H. Walker, General Counsel, Paul Gonson, Solicitor, and Ross A. Albert, Special Counsel, Washington, DC, were on the brief. Jacob H. Stillman, Associate General Counsel, Washington, DC, entered an appearance.

Before: WALD, GINSBURG and HENDERSON, Circuit Judges.

Opinion for the Court filed by Circuit Judge GINSBURG.

Dissenting Opinion filed by Circuit Judge WALD.

GINSBURG, Circuit Judge:

█ A viatical settlement is an investment contract pursuant to which an investor acquires an interest in the life insurance policy of a terminally ill person—typically an AIDS victim—at a discount of 20 to 40 percent, depending upon the insured's life expectancy. When the insured dies, the investor receives the benefit of the insurance. The investor's profit is the difference between the discounted purchase price paid to the insured and the death benefit collected from the insurer, less transaction costs, premiums paid, and other administrative expenses.

Life Partners, Inc., under the direction of its former president and current chairman

Brian Pardo, arranges these transactions and performs certain post-transaction administrative services. The SEC contends that the fractional interests marketed by LPI are securities, and that LPI violated the Securities Act of 1933 and the Securities Exchange Act of 1934 by selling them without first complying with the registration and other requirements of those Acts. The district court agreed and preliminarily enjoined LPI from making further sales.

LPI argues that (1) viatical settlements are exempt from the securities laws because they are insurance contracts within the meaning of the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), and § 3(a)(8) of the 1933 Act, 15 U.S.C. § 77c(a)(8), and (2) the fractional interests sold by LPI are not in any event securities within the meaning of the 1933 and 1934 Acts. LPI asserts alternatively that it could modify its program so as to come within a safe harbor exemption for private offerings under SEC Rule 506, 17 C.F.R. § 230.506.

We agree with the district court that viatical settlements are not exempt from the securities laws as insurance contracts. Contrary to the district court, however, we conclude that LPI's contracts are not securities subject to the federal securities laws because the profits from their purchase do not derive predominantly from the efforts of a party or parties other than the investors; therefore, we do not reach LPI's alternative argument that it might be able to alter its operation in such a way as to be entitled to a private offering exemption.

## I. Background

LPI appeals four orders of the district court. First, in August 1995 the court held that LPI violated §§ 5(a) and (c) of the Securities Act, 15 U.S.C. § 77e(a) and (c), and § 15(a) of the Securities Exchange Act, 15 U.S.C. § 78o(a), by selling unregistered securities. The court ordered LPI to bring its operations into compliance with the Acts "forthwith," but did not enjoin the company from continuing to sell viatical contracts. In the same order the court found that the SEC made out a *prima facie* case that LPI had materially misstated and omitted certain facts in selling securities, in violation of the anti-fraud provisions of § 10(b) of the 1934 Act, 15 U.S.C. § 78j(b), and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5, and preliminarily enjoined LPI from committing securities fraud.

Second, the following month the court denied LPI's motion for a partial stay of the August order pending appeal. The district judge directed LPI to file within 20 days a report detailing the steps the company had undertaken to comply with the securities laws.

Third, in January 1996 the district court, holding that LPI had not adequately complied with its prior directives, preliminarily enjoined LPI from offering or selling unregistered fractional interests in viatical settlements. With the court's approval, the parties stipulated that the injunction would be stayed with respect to transactions then in process, and that LPI would not seek any broader stay pending our resolution of this matter.

Finally, in March 1996 the district court granted an Emergency Motion for Supplemental Provisional Relief that the SEC filed in reaction to an affidavit in which Pardo asserted that LPI had complied with the court's prior rulings and advised the court that LPI planned to resume the sale of viatical settlements. LPI interpreted a statement in the court's opinion of January 1996, to the effect that "pre-purchase activities cannot alone" subject LPI to the Securities Acts, to mean that by discontinuing its performance of post-purchase services, the company could resume its sales without violating the injunction. The district court, however, concluded that LPI's "technical changes have done little to alter the substance of the services provided to investors," and preliminarily enjoined LPI from selling fractional interests in viatical settlements "by any ... means whatsoever," pending this court's decision on appeal.

At the same time that it was issuing these three preliminary injunctions against LPI, the district court acknowledged that the company provides "valuable funds [to] AIDS patients in their final illness" and that after "an

apparently exhaustive two-year investigation" the SEC could produce no evidence or even allegations "that any investor, terminally ill patient, or insurance company has been defrauded, misled, or is in any way dissatisfied with an LPI viatical settlement." The Commission, however, points out that the securities laws, and in particular the disclosure requirements of the 1933 and 1934 Acts, are intended to prevent abuses before they arise. Still, that neither policyholders nor investors have complained of any abuse may help to explain why the viatical settlements industry is not more regulated. A number of states have enacted laws protecting the insureds but, according to the SEC, no state has undertaken specifically to protect investors in viatical settlements. (In all states investors are still protected by the common law of fraud, of course.)

Although some promoters of viatical settlements do register them as securities under the federal securities laws, LPI observes that registration means higher costs for investors and correspondingly lower prices for terminally ill policyholders, and objects that any significant administrative delay—even if the Commission were, for example, to permit the offeror to use one master registration and to make only a supplemental filing pertaining to each policy in which it proposes to sell fractional interests—might be fatal in this time-sensitive context. The Commission concedes that some policy-by-policy disclosure of risk factors would be required but ventures that the burden would not be prohibitive. The Commission also notes that some firms have sought and obtained an exemption from the federal securities laws for their viatical contracts; presumably a firm might also buy insurance policies for its own account or act as an agent, matching a single investor with a terminally ill insured, without running afoul of the securities laws.

That is not how LPI does business, however. LPI sells fractional interests in insurance policies to retail investors, who may pay as little as $650 and buy as little as 3% of the benefits of a policy. In order to reach its customers, LPI uses some 500 commissioned "licensees," mostly independent financial planners. For its efforts, LPI's net compensation is roughly 10% of the purchase price after payment of referral and other fees. Pardo claims that LPI is by far the largest of about 60 firms serving the rapidly growing market for viatical settlements; in 1994 the company accounted for more than half of the industry's estimated annual revenues of $300 million. The company is 95% beneficially owned by Pardo through a trust, and 5% owned by Dr. Jack Kelly, who performs medical evaluations of policyholders on LPI's behalf.

LPI was also the first company to develop a plan by which an investor could participate in a viatical settlement through an Individual Retirement Account. In order to circumvent the Internal Revenue Code prohibition upon IRAs investing in life insurance contracts, LPI structures the purchase through a separate trust established for that purpose. The IRA lends money to the trust, for which it receives a non-recourse note; the trust then uses the loan proceeds to purchase an interest in a life insurance policy, the death benefits of which collateralize the note. When the insured dies and the benefits are paid, the proceeds go to pay off the note held by the IRA.

Both LPI's program for individual investors and its IRA program have gone through three iterations during the course of this litigation. In each, LPI performed or performs a number of pre-purchase functions: Specifically, even before assembling the investors, LPI evaluates the insured's medical condition, reviews his insurance policy, negotiates the purchase price, and prepares the legal documents. The difference among the three versions is that LPI performs ever fewer (and ultimately no) post-purchase functions.

In Version I, the program that was the subject of the district court's August 1995 order, LPI or Pardo could appear, and continue to appear after the investors had purchased their interests, in an insurance company's records as the owner of a policy; LPI insists, however, that this practice was adopted not because LPI had any continuing entrepreneurial role to play but only at the urging of the insurance companies for their administrative convenience; the investor was

at all times the legal owner. Also, once an investor acquired an interest in a policy he could avail himself of LPI's on-going administrative services, which included monitoring the insured's health, assuring that the policy did not lapse, converting a group policy into an individual policy where required, and arranging for resale of the investor's interest when so requested and feasible.

Sterling Trust Company, an independent escrow agent acting for LPI, actually performed most of these post-purchase administrative functions. When the purchase closed, Sterling collected its own fee and that of LPI, escrowed funds for expected premium payments, and delivered the balance to the seller. Thereafter Sterling held the policy, held and disbursed all funds, ensured that all paperwork was in order, and filed the death claim. If an investor designated Sterling as the beneficiary, then Sterling also collected and distributed the death benefits. LPI had no continuing economic interest in the transaction after receipt of its fee upon the sale to the investor.

Between the district court's August 1995 and January 1996 orders, LPI implemented revised procedures in an unsuccessful effort to meet the objections raised by the SEC and upheld by the court. In this Version II, neither LPI nor Pardo appeared as the owner of record of the insurance policy; instead, the investors were at all times the owners of record and thus had a direct contractual relationship with the insurance company. Indeed, Sterling agreed to report to the SEC any attempt by LPI to exercise ownership rights over any policies. Second, LPI affirmed that both the purchase money and the benefit payments would flow through Sterling and not through LPI. Third, LPI disclosed to prospective investors that Pardo is a 95% beneficial owner of LPI and that he had previously been involved in (unrelated) disputes with three federal regulatory agencies (the SEC, the Resolution Trust Corporation, and the Federal Deposit Insurance Corporation). Fourth, investors were informed that they were not obligated to use Sterling's post-purchase services, which were being offered to them as a convenience to take or to leave. In fact, LPI furnished investors with all of the information needed to handle post-purchase activities themselves. The district court determined, however, in its order of January 1996 that these revised procedures still did not comply with the securities laws.

Finally, in yet a further attempt to allay the concerns of the SEC and of the district court, LPI in February 1996 unveiled Version III. Pardo would resign as president of LPI in favor of Mike Posey, the former president of Sterling. More important, LPI declared that it would no longer provide any post-purchase services to purchasers either directly or indirectly (i.e., through an agent such as Sterling). All such services would become the sole responsibility of the investor; Sterling would still be available to provide services as the agent of the investor if the investor elected to contract with Sterling for that purpose. The district court rejected this proposal in its March 1996 order.

## II. Analysis

We take up first LPI's opening argument that viatical settlements are insurance contracts and therefore entitled to an exemption from the 1933 Act. Finding that argument wanting, we proceed to consider whether the fractional interests promoted by LPI are "securities" within the meaning of that Act using the three-part test prescribed in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946), in which each investor acquired an individual parcel of citrus fruit acreage together with a portion of the profits arising from the promoter's management of the citrus grove, *id.* at 295–96, 66 S.Ct. at 1101–02. The Supreme Court held in *Howey* that an investment contract is a security if the investors (1) expect profits from (2) a common enterprise that (3) depends upon the efforts of others. *Id.* at 298–99, 66 S.Ct. at 1102–03. Because LPI's contracts fail the third element of this test, we hold that they are not securities. Finally, we go on to address LPI's program for the sale of viatical settlements to IRAs; the issue there is whether the notes used to facilitate such purchases are themselves securities even though the underlying viatical settlements are not. We conclude that because the notes

do not change the economic substance of the transaction they are not securities.

These are all questions of law and we review them all *de novo*. *See Delaware and Hudson Ry. Co. v. United Transp. Union,* 450 F.2d 603, 620 (D.C.Cir.1971) ("Insofar as the action of the trial judge on a request for preliminary injunction rests on a premise as to the pertinent rule of law, that premise is reviewable fully and *de novo*"). Let us begin.

### A. *Exemption of Viatical Settlements as Insurance Contracts*

■ If viatical settlements are insurance contracts, then they are altogether exempt from coverage under the federal securities laws. *See* Securities Act of 1933, 15 U.S.C. § 77c(a)(8) ("insurance ... policy ... issued by a corporation subject to the supervision of the insurance [authority] of any State" exempt from coverage). In favor of that exemption, LPI argues first that a viatical settlement redistributes risk in the same manner as does an insurance contract. The purchaser incurs a risk that the insured will live longer than anticipated, thus diminishing the present value of the death benefit; the insured is relieved of some of the financial implications of that risk (*e.g.,* the need for funds to cover extended medical care) by taking a reduced but immediate payment. Second, invoking the McCarran–Ferguson Act, 15 U.S.C. § 1012(b), which provides that no federal law may "impair or supersede any law enacted by any State for the purpose of regulating the business of insurance," LPI maintains that its activities of selling and advertising death benefits are part of the "business of insurance," *see SEC v. National Secs., Inc.,* 393 U.S. 453, 460, 89 S.Ct. 564, 568–69, 21 L.Ed.2d 668 (1969) (statute governing sale and advertising of policies regulates "business of insurance"), and further refers us to the district court's finding that a number of states expressly regulate viatical settlements "in the insurance sections of the state codes."

We are advised by LPI that nine states now regulate viatical settlements and that others are considering the Model Viatical Settlements Act drafted by the National Association of Insurance Commissioners. The SEC observes, however, that these regulations protect sellers (insureds), not buyers (investors). LPI rejoins that the dearth of regulations to protect buyers indicates only that the states believe that such regulation is unnecessary. Indeed, the McCarran–Ferguson Act exemption from the federal securities laws is triggered not only when a state prohibits but also when it permits an insurance activity. *See American Mut. Rein. Co. v. Calvert Fire Ins. Co.,* 52 Ill.App.3d 922, 9 Ill.Dec. 670, 675, 367 N.E.2d 104, 109 (1977).

We agree with LPI insofar as it implies that the important question is not whether the states regulate viatical settlements. The scope for federal regulation of viatical settlements does not turn upon whether the states regulate them; federal regulation is foreclosed or not depending upon whether viatical settlements are insurance contracts within the exemption that the Congress of 1933 expressly provided for such instruments, or the marketing of fractional interests is part of the business of insurance within the meaning of the McCarran–Ferguson Act. Accordingly, we focus upon that question.

The district court concluded that LPI "does not issue insurance policies or underwrite risk or undertake the normal activities of an insurance company." The SEC adds that LPI does not engage in the quintessential insurance function of risk-pooling, *i.e.,* transforming what is a highly uncertain outcome for the individual insured into a highly predictable outcome by insuring a large number of persons. That an insurance policy underlies the viatical settlement is, the Commission says, irrelevant; any substantial asset might have served just as well. Moreover, the Commission states that "the business of insurance" referred to in the McCarran–Ferguson Act encompasses the relationship between an insurance company and an insured; the relationship that the SEC wants to regulate is that between a promoter and its investors, and regulation of that relationship "is not insurance regulation, but securities regulation." *See National Secs.,* 393 U.S. at 460, 89 S.Ct. at 569.

The SEC's argument on this score is much more persuasive than LPI's. The seller of a

viatical settlement is not foregoing current consumption in order to protect against future risk, as does the buyer of an insurance policy. Quite the contrary: he is giving up the protection of a policy already in effect, in favor of current consumption. Nor is there any evidence that the typical investor who buys an LPI viatical contract pools the financial risk that the seller will live longer than expected. To do so, the investor would have to acquire enough contracts to reduce the actuarial risk associated with the life span of each individual seller. The record gives no indication, however, that LPI's investors systematically engage in the risk-pooling that is the essential characteristic of insurance. Moreover, there is no reason to expect that state insurance commissioners would regard even the pooling of viatical contracts as a form of insurance. To the extent that regulation of insurance companies is prompted by concern over their ability to pay benefits when due, that concern is simply not applicable to investors in a viatical settlement because the insured receives payment from the investors at the outset; thereafter the investor has no further liability to the insured.

To be sure, the investor's pre-payment of the death benefit diminishes the insured's risk that he will become insolvent before he dies; but as the SEC suggests, that initial risk of insolvency could have been reduced by the insured's liquidation of any asset that he owned. For example, the buyer could just as effectively have purchased the seller's home subject to his reservation of a life estate in the property, or the buyer might have factored the seller's accounts receivable—which, like death benefits, will be paid at an uncertain future date and bear some risk of default. These arrangements—and numerous others—entail roughly the same investment risk-sharing features as the acquisition of a fractional interest in death benefits, but they do not involve an insurance contract. That the underlying asset in this case happens to be an insurance contract is, as the SEC maintains, simply irrelevant.

In short, a viatical settlement is not an insurance policy, and the business of selling fractional interests in insurance policies is no part of "the business of insurance." LPI's offering does not, therefore, qualify for the insurance exemption from the federal securities laws, and is not shielded from federal regulation by the McCarran–Ferguson Act.

## B. The Three–Part Test of Howey

■ We turn next to the question whether the LPI contracts are properly characterized as securities within the terms of the 1933 Act. That determination is controlled by the Supreme Court's decision in *Howey* which, as stated above, holds that an investment contract is a security subject to the Act if investors purchase with (1) an expectation of profits arising from (2) a common enterprise that (3) depends upon the efforts of others. 328 U.S. at 298–99, 66 S.Ct. at 1102–03. To the extent practical we examine each component of the test separately.

### 1. Expectation of Profits

The SEC argues that the profits test requires only that "the investor could lose his investment, or that the value of his return could fluctuate," quoting *Guidry v. Bank of LaPlace*, 954 F.2d 278, 284 (5th Cir.1992), and that, although the death benefit that an investor gets from a viatical settlement is in a fixed dollar amount, the profitability of the investment can vary because of the uncertain interval of time between the date of investment and the date of the insured's death. The insured's life span affects profitability in two ways: First, the annualized rate of return depends upon the length of the investment. Second, unless there has been a waiver of premiums pursuant to the terms of the insurance policy, the amount of the investor's outlay for premiums depends upon the insured's life span.

Arguing against the profits test as set forth in *Guidry*—which, by the way, is unclear about whether possible loss and fluctuating return are sufficient or merely necessary conditions—LPI maintains that under *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852, 95 S.Ct. 2051, 2060, 44 L.Ed.2d 621 (1975), profits must be derived from "either capital appreciation resulting from the development of the initial investment ... or a participation in earnings resulting from the use of the investors'

funds," neither of which obtains with respect to viatical contracts. At oral argument the SEC asserted that even under this formulation viatical settlements satisfy the profits test of *Howey* because they appreciate in value—presumably because the insured's death draws nearer with the passage of time, thus increasing the present value of the death benefit. The Commission's reading of *Forman*, however, starkly omits the requirement that the capital appreciation result "from the development of the initial investment." *Id.* The increased value of a viatical contract requires no "development" at all; it depends entirely upon the inexorable passage of time and the inevitable death of the insured.

On the other hand, the definition in *Forman* was apparently intended only to summarize the cases that had by then come before the Court—not, as LPI implies, to preempt future development upon the basis of further experience. In full context, this is what the Court said:

> By profits, the Court has meant either capital appreciation resulting from the development of the initial investment, as in [*SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 349, 64 S.Ct. 120, 122, 88 L.Ed. 88 (1943) ] (sale of oil leases conditioned on promoters' agreement to drill exploratory well), or a participation in earnings resulting from the use of investors' funds, as in *Tcherepnin v. Knight*, [389 U.S. 332, 339, 88 S.Ct. 548, 554–55, 19 L.Ed.2d 564 (1967) ] (dividends on the investment based on savings and loan association's profits). In such cases the investor is "attracted solely by the prospects of a return" on his investment. *Howey, supra*, [328 U.S.] at 300 [66 S.Ct. at 1103–04]. By contrast, when a purchaser is motivated by a desire to use or consume the item purchased—"to occupy the land or to develop it themselves," as the *Howey* Court put it, *ibid.*—the securities laws do not apply.

421 U.S. at 852–53, 95 S.Ct. at 2060–61. If the examples of *Joiner* and *Tcherepnin* were exhaustive, then the concept of profits would exclude, for example, the return on an investment in a residential mortgage or in any form of consumer loan—neither of which ordinarily involves capital appreciation or earnings resulting from the use of the investors' funds. Both activities are undertaken in the expectation of profits, however, at least as that term is commonly understood.

The Court's general principle we think, is only that the expected profits must, in conformity with ordinary usage, be in the form of a financial return on the investment, not in the form of consumption. This principle distinguishes between buying a note secured by a car and buying the car itself.

The asset acquired by an LPI investor is a claim on future death benefits. The buyer is obviously purchasing not for consumption—unmatured claims cannot be currently consumed—but rather for the prospect of a return on his investment. As we read the *Forman* gloss on *Howey*, that is enough to satisfy the requirement that the investment be made in the expectation of profits.

### 2. Common Enterprise

The second element of the *Howey* test for a security is that there be a "common enterprise." So-called horizontal commonality—defined by the pooling of investment funds, shared profits, and shared losses—is ordinarily sufficient to satisfy the common enterprise requirement. *See, e.g., Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir.1994). Here, LPI brings together multiple investors and aggregates their funds to purchase the death benefits of an insurance policy. If the insured dies in a relatively short time, then the investors realize profits; if the insured lives a relatively long time, then the investors may lose money or at best fail to realize the return they had envisioned; *i.e.*, they experience a loss of the return they could otherwise have realized in some alternative investment of equivalent risk. Any profits or losses from an LPI contract accrue to all of the investors in that contract; *i.e.*, it is not possible for one investor to realize a gain or loss without each other investor gaining or losing proportionately, based upon the amount that he invested. In that sense, the outcomes are shared among the investors; the sum that each receives is a predetermined portion of the aggregate death benefit.

LPI claims, however, that there is no pooling and therefore no shared profits or losses because each investor acquires his own interest in the policy. Moreover, there is no requirement that the entire policy be purchased. It seems to us that the pooling issue reduces to the question whether there is a threshold percentage of a policy that must be sold before an investor can be assured that his purchase of a smaller percentage interest will be consummated. If not, then each investor's acquisition is independent of all the other investors' acquisitions and LPI is correct in asserting that there is no pooling. On the other hand, if LPI must have investors ready to buy some minimum percentage of the policy before the transaction will occur, then the investment is contingent upon a pooling of capital.

When we raised this point at oral argument, the SEC contended that inter-dependency among investors was not necessary to a determination that their funds are pooled; the test, according to the Commission, is whether the funds are "commingled." In this context, however, commingling in itself is but an administrative detail; it is the inter-dependency of the investors that transforms the transaction substantively into a pooled investment. (Indeed, if the investments are inter-dependent, it would not matter if LPI scrupulously avoided commingling the investors' funds—for example, by passing their checks directly to the seller at the closing.) Meanwhile, counsel for LPI volunteered that the issue of selling some minimum acceptable percentage of a policy has never arisen because LPI has always attracted purchasers for the full interest being offered. He went on to acknowledge, however, that if the situation were to arise, LPI would allow the insured the option of withdrawing from the transaction. Such a practice would of course serve LPI's interest as well as that of the policyholder. Many of the post-purchase administrative functions (*e.g.*, monitoring the insured's health, collecting the death benefit) involve costs that are seemingly invariant to the number of investors or the percentage of a policy that has been sold. Neither LPI nor the investors would be anxious to spread these costs over contracts representing much less than the full value of a policy.

Therefore, we think that pooling is in practice an essential ingredient of the LPI program; that is, any individual investor would find that the profitability if not the completion of his or her purchase depends upon the completion of the larger deal. Because LPI's viatical settlements entail this implicit form of pooling, and because any profits or losses accrue to all investors (in proportion to the amount invested), we conclude that all three elements of horizontal commonality—pooling, profit sharing, and loss sharing—attend the purchase of a fractional interest through LPI. (We need not reach, therefore, the SEC's alternate contention that the LPI program entails "strict vertical commonality"—another formulation of the common enterprise test recognized in some circuits. *See, e.g., Brodt v. Bache & Co., Inc.*, 595 F.2d 459, 461 (9th Cir.1978).)

Although horizontal commonality is ordinarily enough to make out the common enterprise required under the *Howey* test, in this instance LPI argues that commonality is not a sufficient condition because it is not obvious that there is an "enterprise" in the picture. For this LPI relies heavily upon *Rodriguez v. Banco Central Corp.*, 990 F.2d 7, 10 (1993), in which the First Circuit held that "[e]ven if bought for investment, the land itself does not constitute a business enterprise." In that case the investors purchased lots in Florida; the land had value in itself, and the seller had created no "enterprise" that would have an effect upon that value. LPI suggests that the investors in a viatical settlement likewise are buying only their fractional interest in the death benefit, not a share in a common business enterprise.

The SEC, for its part, would have us distinguish *Rodriguez* from the present case on the ground that here the promoter makes specific commitments effective after the investors purchase their interests. Indeed, the First Circuit did remark that "commitments and promises incident to a land transfer . . . can cross over the line and make the interest acquired one in an ongoing business enterprise." *Id.* at 11. As the SEC's response implies, however, LPI's argument that there is no enterprise in the picture is more prop-

erly addressed to the third part of the *Howey* test—whether profits are expected to arise from the efforts of others. We consider that question in the next section, where we take up the importance of the promoter's post-purchase commitments.

### 3. Profits Derived Predominantly from the Efforts of Others

The final requirement of the *Howey* test for an investment to be deemed a security is that the profits expected by the investor be derived from the efforts of others. In this connection, the SEC suggests that investors in LPI's viatical settlements are essentially passive; their profits, the Commission argues, depend predominantly upon the efforts of LPI, which provides pre-purchase expertise in identifying existing policyholders and, together with Sterling, provides post-purchase management of the investment. Meanwhile, LPI argues that its pre-purchase functions are wholly irrelevant and that the post-purchase functions, by whomever performed, should not count because they are only ministerial. On this view, once the transaction closes, the investors do not look to the efforts of others for their profits because the only variable affecting profits is the timing of the insured's death, which is outside of LPI's and Sterling's control.

By its terms *Howey* requires that profits be generated "solely" from the efforts of others. 328 U.S. at 298, 66 S.Ct. at 1102–03. Although the lower courts have given the Supreme Court's definition of a security broader sweep by requiring that profits be generated only "predominantly" from the efforts of others, *see, e.g., SEC v. International Loan Network, Inc.,* 968 F.2d 1304, 1308 (D.C.Cir.1992); *Goodman v. Epstein,* 582 F.2d 388, 408 n. 59 (7th Cir.1978), they have never suggested that purely ministerial or clerical functions are by themselves sufficient; indeed, quite the opposite is ⁺rue. *See, e.g., SEC v. Koscot Interplanetary, Inc.,* 497 F.2d 473, 483 (5th Cir.1974); *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973) (efforts of others must be "undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise"). Because

post-purchase entrepreneurial activities are the "efforts of others" most obviously relevant to the question whether a promoter is selling a "security," we turn first to the distinction between those post-purchase functions that are entrepreneurial and those that are ministerial; thereafter, we consider the relevance of pre-purchase entrepreneurial services.

*Ministerial versus entrepreneurial functions, post-purchase.* In Version I of its program, LPI and not the investor could appear as the owner of record of the insurance policy. LPI's ownership gave it the ability, post-purchase, to change the party designated as the beneficiary of the policy, indeed to substitute itself as beneficiary. That ability tied the fortunes of the investors more closely to those of LPI in the sense that it made the investors dependent upon LPI's continuing to deal honestly with them, at least to the extent of not wrongfully dropping them as beneficiaries.

This does not, however, establish an association between the profits of the investors and the "efforts" of LPI. Nothing that LPI could do by virtue of its record ownership had any effect whatsoever upon the near-exclusive determinant of the investors' rate of return, namely how long the insured survives. Only if LPI misappropriated the investors' funds, or failed to perform its post-purchase ministerial functions, would it affect the investors' profits. Such a possibility provides no basis upon which to distinguish securities from non-securities. The promoter's "efforts" not to engage in criminal or tortious behavior, or not to breach its contract are not the sort of entrepreneurial exertions that the *Howey* Court had in mind when it referred to profits arising from "the efforts of others."

In Version II LPI no longer appeared as the record owner of a policy, but LPI and Sterling continued to offer the following post-purchase services: holding the policy, monitoring the insured's health, paying premiums, converting a group policy into an individual policy where required, filing the death claim, collecting and distributing the death benefit (if requested), and assisting an investor who might wish to resell his interest. LPI characterizes these functions as clerical and rou-

tine in nature, not managerial or entrepreneurial, and therefore unimportant to the source of investor expectations; in sum, anyone including the investor himself could supply these services. The district court seemed to agree with LPI about the character if not the significance of most post-purchase services, for it described them as "often ministerial in nature."

The Commission disputes the district court's characterization of post-purchase services as ministerial, but attempts to portray only one service in particular as entrepreneurial: we refer to the secondary market that LPI purportedly makes. By establishing a resale market, according to the SEC, LPI links the profitability of the investments it sells to the success of its own efforts. We find this argument unconvincing for several reasons. First, there is no evidence in the record before us that investors actually seek to liquidate their investments prior to the receipt of death benefits. Second, there is no evidence that LPI's potential assistance adds value to the investment contract; an investor could, for all that appears, get the same help with resale (if any is needed) through any one of the many firms that sell viatical settlements. Third, LPI is quite specific in warning its clients that

> viatical transactions are not liquid assets. There is no established market for the resale of such policies. They should be purchased only by persons who are willing and able to hold the policy until it matures.... Life Partners' present practice is to assist in the resale of policies purchased by its clients [but] ... [t]here is no guarantee that any policy can be resold, or that resale, if it occurs, will be at any given price.

LPI's promise of help in arranging for the resale of a policy is not an adequate basis upon which to conclude that the fortunes of the investors are tied to the efforts of the company, much less that their profits derive "predominantly" from those efforts.

In Version III LPI provides no post-purchase services. All such services are the sole responsibility of the investors, who may purchase them from Sterling or not, as they choose. The district court minimized the significance of this choice, stating that "it is neither realistic nor feasible for multiple investors, who are strangers to each other, to perform post-purchase tasks without relying on the knowledge and expertise of a third party [and] the third party in this case will almost certainly be Sterling." Even if we accept this assessment, it does not alter our analysis. As we have seen, none of Sterling's post-purchase services can meaningfully affect the profitability of the investment. It is therefore of no moment whether Sterling performs those services usually or always, or whether it does so as the agent of LPI or as the agent of the investor.

In sum, the SEC has not identified any significant non-ministerial service that LPI or Sterling performs for investors once they have purchased their fractional interests in a viatical settlement. Nor do we find that any of the ministerial functions have a material impact upon the profits of the investors. Therefore, we turn to the question whether LPI's pre-purchase services count as "the efforts of others" under the *Howey* test.

*Entrepreneurial functions, pre-purchase.* LPI's assertion that its pre-purchase efforts are irrelevant receives strong, albeit implicit, support from the Ninth Circuit decision in *Noa v. Key Futures, Inc.*, 638 F.2d 77 (1980) (*per curiam*). In that case, which involved investments in silver bars, the court observed that the promoter made pre-purchase efforts to identify the investment and to locate prospective investors; offered to store the silver bars at no charge for a year after purchase and to repurchase them at the published spot price at any time without charging a brokerage fee. The court concluded, however, that these services were only minimally related to the profitability of the investment: "Once the purchase ... was made, the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]." *Id.* at 79–80.

The Tenth Circuit applied the same principle (to reach a different result) with respect to an investment in undeveloped land. *McCown v. Heidler*, 527 F.2d 204 (1975). In that case, the plaintiffs claimed that the parcels they had purchased were securities. In marketing the parcels to potential investors

the promoters had promised to make future improvements to the lots. "[W]ithout the substantial improvements pledged by [the promoters] the lots would not have a value consistent with the price which purchasers paid.... The utilization of purchase money accumulated from lot sales to build the promised improvements" could bring the scheme within the purview of the securities laws. *Id.* at 211.

In both *Noa* and *McCown*, the courts of appeals regarded the promoter's pre-purchase efforts as insignificant to the question whether the investments—in silver bars and parcels of land, respectively—were securities. The different outcomes trace wholly to the promoters' commitment to perform meaningful post-purchase functions in *McCown* but not in *Noa.*

In the present case, the district court distinguished *Noa* on the ground that, because silver is a fungible commodity, the ｝ ﾞmoter's pre-purchase efforts were inconsequential; LPI, in contrast, performed highly specialized functions in identifying and evaluating individual policies suitable for purchase by investors. Still, the district court declared (in its January 1996 opinion) that "pre-purchase activities cannot alone support a finding that investors' profits derive from the activities of LPI." Instead, the court relied upon the "pre-closing activities in addition to the post-closing activities that LPI continues to perform."

The Commission at oral argument tried to distance itself from *Noa* on roughly the same ground, arguing that an investor could, without great effort, independently evaluate the silver bars in that case, whereas an LPI investor would have considerably greater difficulty, especially in those instances where the terminally ill insured insists upon anonymity until the closing of the sale. LPI counters that its investors also play an active pre-purchase role in setting their own purchase criteria (such as the insured's life expectancy and the minimum acceptable risk rating of the insurer) and reviewing the insured's health profile and his insurance policy. Even if true, the district court appropriately characterized LPI's pre-purchase efforts as "undeniably essential to the over-all success of the investment." The investors rely heavily, if not exclusively, upon LPI to locate insureds and to evaluate them and their policies, as well as to negotiate an attractive purchase price.

The SEC urges us to go even further than did the district court, however, in appraising the significance of LPI's pre-purchase activities insofar as they count toward "the efforts of others." The Commission reminds us that the Supreme Court did not draw a bright line distinction in *Howey* between pre- and post-purchase efforts, and notes that LPI may continue to perform some functions, such as preparing the preliminary agreement and evaluating the insured's policy and medical file, right up to the closing of the transaction. Therefore it would be hypertechnical, according to the Commission, to discount the importance of LPI's pre-purchase entrepreneurial functions simply because they occur before the moment of closing.

Absent compelling legal support for the Commission's theory—and the Commission actually furnishes no support at all—we cannot agree that the time of sale is an artificial dividing line. It is a legal construct but a significant one. If the investor's profits depend thereafter predominantly upon the promoter's efforts, then the investor may benefit from the disclosure and other requirements of the federal securities laws. But if the value of the promoter's efforts has already been impounded into the promoter's fees or into the purchase price of the investment, and if neither the promoter nor anyone else is expected to make further efforts that will affect the outcome of the investment, then the need for federal securities regulation is greatly diminished. While, to be sure, coverage under the 1933 Act might increase the quantity (and perhaps the quality) of information available to the investor prior to the closing, "the securities laws [are not] a broad federal remedy for all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982). They are concerned only with securities fraud, and the question before us is the threshold question whether a fractional interest in a viatical settlement is a security. To answer that question we look for "an investment in a

common venture" with profits "derived from the entrepreneurial or managerial efforts of others." *Forman,* 421 U.S. at 852, 95 S.Ct. at 2060.

We see here no "venture" associated with the ownership of an insurance contract from which one's profit depends entirely upon the mortality of the insured—just as the First Circuit saw no "enterprise" associated with holding land for investment in *Rodriguez,* 990 F.2d at 10. Nor is the combination of LPI's pre-purchase services as a finder-promoter and its largely ministerial post-purchase services enough to establish that the investors' profits flow predominantly from the efforts of others.*

While we doubt that pre-purchase services should ever count for much, for present purposes we need only agree with the district court that pre-purchase services cannot by themselves suffice to make the profits of an investment arise predominantly from the efforts of others, and that ministerial functions should receive a good deal less weight than entrepreneurial activities. The SEC (like the district court) has identified no post-purchase service provided by LPI or Sterling that could fairly be characterized as entrepreneurial and combined with LPI's pre-purchase services to affect the outcome of the *Howey* test. Nor has the Commission pointed to a single case in which an investment vehicle was deemed a security subject to the federal securities laws although the investor did not look to the promoter (or another party) to provide significant post-purchase efforts.

In this case it is the length of the insured's life that is of overwhelming importance to the value of the viatical settlements marketed by LPI. As a result, the SEC is unable to show that the promoter's efforts have a predominant influence upon investors' profits; and

because all three elements of the *Howey* test must be satisfied before an investment is characterized as a security, *Revak,* 18 F.3d at 87, we must conclude that the viatical settlements marketed by LPI are not securities.

### C. The LPI Program for IRA Investments in Viatical Settlements

■ Finally, we must resolve the question, which the district court did not reach, whether the notes issued under the company's IRA program might be securities even though the underlying fractional interests in viatical settlements are not. In brief, the program is structured as follows: LPI establishes a separate trust for each investor's IRA; the trust borrows money from the IRA and issues a non-recourse note in exchange. The trust uses the loan proceeds to invest in a viatical contract, the death benefits of which collateralize the note. When the death benefits are ultimately paid, the trust distributes them to the IRA in satisfaction of the note.

The SEC urges that we decide whether the notes are securities by application of the "family resemblance test" of *Reves v. Ernst & Young,* 494 U.S. 56, 65, 110 S.Ct. 945, 951, 108 L.Ed.2d 47 (1990), pursuant to which a note is deemed to be a security unless it resembles one of a list of instruments that are not securities. Because we have already determined, however, that the underlying viatical contracts are not securities, and because the essential characteristics of the investment are no different whether the purchaser is an IRA or an individual investor, the status of the notes under the 1933 Act does not require extended analysis.

The note is used in these transactions, as the SEC itself affirms in its brief, merely in order to navigate around certain restrictions

---

* Our dissenting colleague suggests that pre-purchase managerial activities are alone sufficient if they are the predominant factor in determining whether profits are eventually realized. Dissent at 551. In support of this proposition she can find only a *dictum* in a district court case, *SEC v. Brigadoon Scotch Distribs., Ltd.,* 388 F.Supp. 1288, 1293 (S.D.N.Y.1975), in which—as the dissent concedes—the promoter's managerial efforts continued post-purchase through its agreement to repurchase the coins it was selling. In-

deed, the district court's holding was controlled by *Glen–Arden Commodities, Inc. v. Costantino,* 493 F.2d 1027 (1974), in which the Second Circuit had held that even though the "very investment to be made was in [Scotch whiskey] *to be specifically selected* " by the promoters, the promise by the promoters to "find buyers for the Scotch or buy it back themselves" was the primary reason for characterizing the investment as a security. *Id.* at 1035 (original emphasis).

in the tax code that preclude IRAs from investing in life insurance contracts. If the individual who owns the IRA wants to invest the IRA's capital in a viatical settlement, then the note is nothing more than a device by which to make that investment in a form that complies with the tax code; use of the note does not alter the substance of the transaction in any manner that would suggest a role for the securities laws that is not otherwise indicated by law. In this we follow directly the teaching of the Supreme Court: "[I]n searching for the meaning and scope of the word 'security' in the Act, form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin*, 389 U.S. at 336, 88 S.Ct. at 553. Applying this precept, we hold that the notes—like the viatical contracts for which they stand—are not securities.

### III. Summary and Conclusion

LPI advances two arguments in support of the proposition that its viatical settlements are not subject to the federal securities laws. First, the company contends that its contracts are exempt as insurance contracts under the Securities Act of 1933 and the McCarran–Ferguson Act. For the reasons set forth in Part II.A, however, we conclude that a viatical settlement is not an insurance policy, and that the business of selling fractional interests in insurance policies is not part of "the business of insurance." We therefore reject LPI's exemption argument.

Second, LPI maintains that the fractional interests which it sells to investors are not securities within the meaning of the 1933 Act, as controlled by the Supreme Court's decision in *Howey*. In Parts II.B(1) and II.B(2), respectively, we conclude that LPI's contracts meet two parts of the *Howey* test: investors purchase the contracts with an expectation of profits; and they pool their funds, then share any profits or losses that arise. In Part II.B(3), however, we hold that fractional interests in viatical settlements, in any of the three versions marketed or proposed by LPI, are not securities. The combination of LPI's pre-purchase services as a finder-promoter and its largely ministerial post-purchase services is not enough to satis-

fy the third requirement in *Howey:* the investors' profits do not flow predominantly from the efforts of others. Finally, we hold that the notes issued to IRAs by LPI-sponsored trusts are not securities either. Looking to the substance of such transactions, we see that the notes are used solely for tax purposes, not as a means of raising capital.

Accordingly, this case is remanded to the district court with instructions to vacate the three injunctions entered against LPI in August 1995, January 1996, and March 1996.

*So ordered.*

WALD, Circuit Judge, dissenting.

I agree with the majority that viatical settlements are not exempt from the securities laws as insurance contracts, that notes issued under Life Partners, Inc.'s ("LPI") IRA program are not securities, and also that LPI's viatical settlements meet the first two requirements of the three-part test for an investment contract set out in *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 1102–03, 90 L.Ed. 1244 (1946). These two requirements are that investors in viatical settlements (1) expect profits from (2) a common enterprise. I part company with the majority, however, because I believe that the third requirement of the *Howey* test, that (3) the expected profits be generated solely from the efforts of others, is also met here.

Several background principles should guide our analysis of whether or not the fractional interests in viatical settlements marketed by LPI satisfy *Howey*'s third prong and therefore are securities. One such principle is that we should avoid imposing overly formal restrictions on what qualifies as a security and instead apply securities laws flexibly so as to achieve their remedial purposes. *Pinter v. Dahl*, 486 U.S. 622, 653, 108 S.Ct. 2063, 2081–82, 100 L.Ed.2d 658 (1988); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 195, 84 S.Ct. 275, 284, 11 L.Ed.2d 237 (1963); *Baurer v. Planning Group, Inc.*, 669 F.2d 770, 772 (D.C.Cir. 1981). In *Howey* the Court stated that the definition of security "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who

seek the use of the money of others on the promise of profits." *Howey*, 328 U.S. at 299, 66 S.Ct. at 1103. It has repeated this mantra of flexibility in subsequent cases applying the *Howey* test, and has consistently underscored that "form should be disregarded for substance and the emphasis should be on economic reality." *Tcherepnin v. Knight*, 389 U.S. 332, 336, 88 S.Ct. 548, 553, 19 L.Ed.2d 564 (1967); *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 848–49, 95 S.Ct. 2051, 2058–59, 44 L.Ed.2d 621 (1975).

A second principle, however, is that the securities laws do not grant federal protection to all investments, but only to that subcategory of investments that are securities. *Marine Bank v. Weaver*, 455 U.S. 551, 556, 102 S.Ct. 1220, 1223, 71 L.Ed.2d 409 (1982) ("Congress, in enacting the securities laws, did not intend to provide a broad federal remedy for all fraud"); *Northland Capital Corp. v. Silver*, 735 F.2d 1421, 1431 (D.C.Cir. 1984). Hence, although the securities laws are to be interpreted flexibly and cover many arrangements that do not superficially resemble securities, they cannot be interpreted so flexibly as to cover every type of investment. The paradigmatic instance of an investment that is not a security is the mere purchase of land with the hope that its value will naturally increase. *See, e.g., Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir.1993) ("[a] simple sale of land, whether for investment or use, is not a 'security' ").

The third and final principle is that the securities laws, and in particular the Securities Act of 1933 and the Securities Exchange Act of 1934 which are the statutes at issue here, embody the belief that information is the most important form of investor protection. The Court has remarked that "the design of the[se] statute[s] is to protect investors by promoting full disclosure of information thought necessary to informed investment decisions," and it has used this concern for ensuring adequate access to information to guide its application of the Acts. *SEC v. Ralston Purina Co.*, 346 U.S. 119, 124–26, 73 S.Ct. 981, 984–85, 97 L.Ed. 1494 (1953); *see also Capital Gains Research Bureau*, 375

U.S. at 186, 84 S.Ct. at 280 ("[a] fundamental purpose, common to [the securities laws], was to substitute a philosophy of full disclosure for the philosophy of *caveat emptor*"); LOUIS LOSS & JOEL SELIGMAN, 1 SECURITIES REGULATION 171–94, 391–94 (3d ed.1989) (describing the disclosure philosophy of the securities laws). A new security must be registered before it can be publicly offered, which means simply that information on the security, issuer and underwriter must be submitted to the Securities and Exchange Commission ("SEC"). If there has been adequate and complete disclosure, the SEC has no power to prevent a security from being marketed because it believes the security to be too risky. LOSS, *supra*, at 227–29.

As the majority indicates, prior cases have established that in order for the third prong of the *Howey* test to be met the activities of the promoter must be of a managerial or entrepreneurial character, and not merely ministerial or clerical. Majority opinion ("Maj. op.") at 545. In the words of the Ninth Circuit, the third prong of *Howey* is satisfied when "the efforts by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enters., Inc.*, 474 F.2d 476, 482 (9th Cir.), *cert. denied*, 414 U.S. 821, 94 S.Ct. 117, 38 L.Ed.2d 53 (1973); *see also Forman*, 421 U.S. at 852, 95 S.Ct. at 2060 ("touchstone of [the *Howey* test] is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others"). Prior cases have also held that *Howey*'s third prong should be interpreted broadly to allow an investment contract to exist where the profits come "predominantly," but not solely, from the efforts of others. *See, e.g., SEC v. International Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C.Cir.1992).

The key question for us is whether the third prong of the *Howey* test is met when the managerial activities of the promoter occur only before the investment is purchased.[1]

---

1. I agree with the majority's characterization of LPI's post-purchase activities—holding the poli-

cy, monitoring the insured's health, paying premiums, converting a group policy into an indi-

The district court took the position there is no need for post-purchase activities to be managerial activities, provided that there are some post-purchase activities and at some point the promoter has performed managerial activities. I agree with the majority that this approach fails. Insisting that some activity must occur after purchase but allowing any activity, no matter how trivial, to satisfy this requirement violates the principle that form should not be elevated over substance and economic reality.

The majority instead takes the position that in order for *Howey*'s third prong to be satisfied, the promoter must perform managerial and entrepreneurial activities after the investment is purchased. Maj. op. at 547–48. The net effect of the majority's position is to incorporate a bright-line rule into *Howey*'s third prong: whatever the surrounding circumstances, an investment is not a security unless significant managerial activities by the promoter occur post-purchase. The advantage of this approach is that it offers a clear method for distinguishing between investment contracts that are securities and investment contracts that are simply investments. In that regard, it accords with the principle that the securities laws cannot be so broadly interpreted as to encompass all investments. But it does so at a substantial cost. Like the district court's approach, it elevates a formal element, timing, over the economic reality of the investors' dependence on the promoter.

Even more troubling, the majority's approach undercuts the flexibility and ability to adapt to "the countless and variable schemes" that are the hallmarks of the *Howey* test. *Howey,* 328 U.S. at 299, 66 S.Ct. at 1103.

I agree that the requirement of *Howey*'s third prong is most clearly met where the promoter engages in post-purchase activities. But I do not believe that investments based on pre-purchase managerial activities only should be categorically excluded from the coverage of the acts. Rather, I would distinguish between investments that satisfy the *Howey* third prong and those which do not by focusing on the kind and degree of dependence between the investors' profits and the promoter's activities. I believe that the third prong of the *Howey* test can be met by pre-purchase managerial activities of a promoter when it is the success of these activities, either entirely or predominantly, that determines whether profits are eventually realized. These pre-purchase activities must be directed at the sale of the investment opportunity; for example, efforts to build up a business are directed at making a business successful and therefore would not qualify, even if the ultimate aim is to sell the business to an investor. *Cf. Emisco Indus. Inc. v. Pro's Inc.,* 543 F.2d 38, 40–41 (7th Cir.1976). In practice, this requirement may impose a time element, as activities that do not occur around the time of sale are unlikely to be found to be directed at the sale of an invest-

---

vidual policy if required, and collecting and distributing the death benefit—as ministerial, but with two caveats. First, unlike the majority, I consider LPI's promise to assist in the resale of policies combined with its emphasis on the availability of resale opportunities to constitute a managerial post-purchase activity. Lifetime Funding Newsgram (January 1994), *reprinted in* Joint Appendix ("JA") IIIB 3182–83; *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 756 F.2d 230, 240–41 (2d Cir.1985) (stressing Merrill Lynch's promise to maintain a secondary market for resale of certificates of deposit ("CD") in finding *Howey* test satisfied). I agree with the majority, however, that LPI does not in general highlight the resale option but on the contrary warns investors that "[l]ife insurance policies purchased through viatical transactions are not liquid assets." LPI, Report of Compliance Efforts, *reprinted in* JA–S 4123; Maj. op. at 546–47. Although LPI did emphasize the possibility of resale in regard to policies with longer terms (24–36 months and 36–48 months), LPI indicated in its reply brief that it has stopped doing so and now includes the same warning about the lack of liquidity in this context as well. Reply Br. at 13 n.8.

Second, I attach greater significance than the majority does to the fact that in Version I LPI often appeared as the owner of record of the policy and not the investors. As the district court noted, this meant that creditors of LPI might be able to reach the policies were LPI to encounter financial difficulties. Consequently, the investors' profits were dependent on LPI's efforts to remain a financially viable company and not simply, as the majority claims, on LPI's "'efforts' not to engage in criminal or tortious behavior." Maj. op. at 545. But LPI no longer appears as the record owners of the policies, and therefore my disagreement with the majority on this point is not material.

ment opportunity. But provided the promoter's activities are so directed, the fact that the activities occurred prior to purchase would not bar the investment from qualifying as an investment contract under *Howey*.

On the other hand, if the realization of profits depends significantly on the post-investment operation of market forces, pre-investment activities by a promoter would not satisfy *Howey*'s third prong. In such a situation, the realization of investor profits is fundamentally outside of the promoter's control and the investor's dependence on the promoter is more circumscribed. By the same logic, *Howey*'s third prong would not be satisfied whenever the promoter's managerial activities occurred prior to purchase and the realization of profits depended significantly on outside forces, such as a lottery. *See, e.g., SEC v. Energy Group of America, Inc.*, 459 F.Supp. 1234, 1240 (S.D.N.Y.1978). However, occasions where profits are determined by the operation of market forces will likely be the most common version of this situation.

The reason I focus on the degree of dependence between the investors' profits and the promoter's activities is twofold. First, I believe that this focus is more in keeping with the tenor of the Supreme Court's opinions applying *Howey* and its concern that regulation be tied to underlying economic reality instead of form. Second, I believe that distinguishing between profits realized from the promoter's activities and profits realized from the operation of market forces coheres with the belief that investors are protected by access to information. When profits depend on the intervention of market forces, there will be public information available to an investor by which the investor could assess the likelihood of the investment's success. Thus, for example, a purchaser of silver bars has access to information on the trends in silver prices, an investor in paintings can get a sense, at least generally, of how the market for artwork is faring, and a purchaser of an undeveloped lot has access to information on growth trends in the area. Obviously, the degree to which this information is actually available to an investor depends on the sophistication and education of

an investor, but that is true about investments generally. Moreover, where profits depend on the operation of market forces "registration ... could provide no data about the seller which would be relevant to those market risks." *SEC v. G. Weeks Securities, Inc.*, 678 F.2d 649, 652 (6th Cir.1982).

Where profits depend on the success of the promoter's activities, however, there is less access to protective information and the type of information that is needed is more specific to the promoter. Given the pivotal role of the promoter's activities, what the investor needs to know is not generally how this type of activity has fared but what the specific risk factors attached to the investment are and whether there is any reason why the investor should be leery of the promoter's promises. This need for information holds true in regard to investors prior to purchase as much as to investors who have committed their funds—indeed, more so, if they are to avoid over-risky investments. The majority argues that we need not be concerned about protecting investors where the profitability of an investment hinges on pre-purchase activities. Maj. op. at 548. Presumably this is because investors already have a potent weapon—they can refuse to invest in the policy. But the claim that investors need not be protected prior to committing funds has been rejected by Congress, which made the goal of ensuring that investors have adequate information before they commit their money or enter contracts the central concern of the Securities Acts. *Capital Gains Research Bureau*, 375 U.S. at 186, 84 S.Ct. at 280; *Ralston Purina*, 346 U.S. at 124–26, 73 S.Ct. at 984–85.

By far, most cases finding the *Howey* test to be met involve situations in which post-purchase managerial activities either occur or are promised. In *Howey*, for example, the promoter not only sold orchard lots but also contracted to manage the lots as an orchard after they were purchased. *Howey*, 328 U.S. at 299–300, 66 S.Ct. at 1103. But there is precedent supporting an approach that focuses on the degree and kind of dependence between the investors' profits and the promoter, rather than on the timing of the promoter's efforts. Contrary to the ma-

jority's suggestion that pre-purchase activities may be altogether irrelevant, see Maj. op. at 548, courts frequently refer to pre-purchase as well as post-purchase activities of the promoter in finding *Howey*'s third prong met. In *Glen–Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974), for example, the Second Circuit noted that investors' profits depended on the promoter's expertise in selecting whiskey for investors to purchase as well as on the promoter's promise to buy back the whiskey in the future. *Id.* at 1035; *see also Gary Plastic*, 756 F.2d at 240–41 (finding an investment contract where promoter both promised to maintain a secondary market for CDs—a post-purchase managerial activity— and used its market power to negotiate favorable CD rates with participating banks—a pre-purchase activity); *Gordon v. Terry*, 684 F.2d 736, 740 n. 4, 742–43 (11th Cir.1982), *cert. denied*, 459 U.S. 1203, 103 S.Ct. 1188, 75 L.Ed.2d 434 (1983) (emphasizing promoter's claimed expertise in locating bargain-priced Florida properties for investor to purchase, as well as promoter's post-purchase activities of structuring leverage scheme and utilizing personal contacts to ease resale, in denying summary judgment on question of whether investment contract existed).

Indeed, there are occasions, albeit rare, when most of the promoter's significant managerial activities occur before purchase and a court has found *Howey*'s third prong satisfied. One such instance is *SEC v. Brigadoon Scotch Distribs., Ltd.*, 388 F.Supp. 1288 (S.D.N.Y.1975), in which a promoter both selected coins for purchase and offered post-purchase buy-back and accounting services. While it is true that the promoter's post-purchase activities in this case qualify as managerial, the court specifically stated that the promoter's selection activities alone were sufficient to satisfy *Howey*'s third prong because "[c]oins do not appreciate in value at the same rate and accordingly their selection is the most crucial factor in determining how much profit an investor in coins will make." *See id.* at 1293. Another is *Bailey v. J.W.K. Properties, Inc.*, 904 F.2d 918 (4th Cir.1990), where the promoter selected specially bred cow embryos for investors to purchase and then raised and marketed the cows. Al-

though the promoter's activities in raising and marketing the cows occurred post-purchase, the Fourth Circuit emphasized the promoter's pre-purchase activity of selecting and crossbreeding embryos in finding that *Howey*'s third prong was met:

> If the investment scheme had been merely to raise cattle for slaughter, the interests purchased by the plaintiffs may not have constituted investment contracts....
>
> However, the Albemarle Farms program also involved the selection of embryos and crossbreeding. The plaintiffs had no expertise in making such selections and had an extremely limited range of alternative sources of such information.

*Id.* at 924–25; *see also Energy Group*, 459 F.Supp. at 1241 (purchase of property in expectation that it will appreciate due to promoter's expertise in selecting the property is one category of investment contract); 5B Arnold S. Jacobs, Litigation Under Rule 10b-5, § 38.03[b][I] at 2–212, § 38.03[b][v], at 2–258 (1996) (quoting *Energy Group* and arguing that promoter activities taking place concurrent with or after sale of security satisfy *Howey*'s third prong).

Notably, I have found no case which holds, as the majority here does, that pre-purchase activities alone cannot satisfy *Howey*'s third prong. Even the cases cited by the majority in support of its position do not argue that the pre-purchase/post-purchase line has determinative significance. Rather, the decisions in these cases appear to turn on the role that market forces as opposed to the promoter's activities play in the realization of profits. For example, *Noa v. Key Futures, Inc.*, 638 F.2d 77 (9th Cir.1980), held that the purchase of silver bars, even with the promoter's offer to store and repurchase the silver, was not an investment contract. In reaching this decision the Ninth Circuit emphasized that "the profits to the investor depended upon the fluctuations of the silver market, not the managerial efforts of [the promoter]." *Id.* at 79. On the other hand, in *McCown v. Heidler*, 527 F.2d 204 (10th Cir. 1975), the Tenth Circuit held that sales of real estate parcels constituted investment contracts because the price of the parcels reflected the value of the promoter's develop-

ment activities. *Id.* at 211; *see also SEC v. Belmont Reid & Co., Inc.,* 794 F.2d 1388, 1391 (9th Cir.1986) (*Howey's* third prong not met where primary purpose of prepayment plan involving purchase of gold coins was "to profit from the anticipated increase in the world price of gold"); *Jenson v. Continental Financial Corp.,* 404 F.Supp. 792, 803 (D. Minn.1975) (*Howey* third prong is not met by commodity futures contracts because "[t]he profitability of the investment is solely dependent on the operation of the commodities market and the investors [sic] own investment decisions"). Although in *Rodriguez* the First Circuit focused on *Howey's* second prong, the existence of a common enterprise, it found the question of whether the value of the investment derives from the operation of the market or the actions of the promoters to be of critical importance. The First Circuit maintained that the sale of real estate could not constitute an investment contract where the promoter did not promise to develop the land and instead it was expected to appreciate by "natural forces," specifically economic growth spurred by the presence of Disney World. *Rodriguez,* 990 F.2d at 11–12.

The approach I advocate—allowing *Howey's* third prong to be met by pre-purchase managerial activities of a promoter when the eventual realization of profits depends predominantly on these activities and not on the market—is also supported by the line of cases applying *Howey's* third prong to general partnerships. The investment in these cases is a contribution of capital in return for an interest in an ongoing partnership, and thus they do not address the specific question of whether pre-purchase activities alone can create an investment contract. But these cases are relevant because they demonstrate that other courts have been concerned to apply *Howey's* third prong flexibly and with an eye to protecting passive investors who are at an informational disadvantage in regard to a promoter or who must rely on a promoter for some unique expertise. Since the terms of general partnership agreements usually grant all partners authority to participate in decisionmaking, investments in general partnerships would appear to fail the requirement of *Howey's* third prong that profits must come predominantly from the

efforts of others. Instead, several courts have adopted an approach that focuses not on the terms of the partnership agreement but on the relationship between the investor and the promoter. Under this approach, a general partnership can constitute an investment contract if the agreement grants the partner little control, "the partner . . . is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership . . . powers," or "the partner . . . is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager." *Williamson v. Tucker,* 645 F.2d 404, 424 (5th Cir.), *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *see also Koch v. Hankins,* 928 F.2d 1471, 1476–78 (9th Cir.1991)(adopting *Williamson* test); *Matek v. Murat,* 862 F.2d 720, 728 (9th Cir.1988)("access to information about the investment, and not managerial control, is the most significant factor" in applying the securities acts).

It is true that there is no clear line distinguishing when a promoter's pre-purchase activities predominate in the realization of profits and when market forces play a significant role. But I expect that in practice this distinction would not be a difficult one to make, and that the background principles of federal securities regulation would help decide close cases. I also expect that the occasions where investment profits depend predominantly on an investor's pre-purchase activities are extremely rare. As the cases above illustrate, the most common pre-purchase managerial activity is the use of some special expertise to select items for purchase. Usually, however, the purpose of this selection is to identify items "within a particular class of items which will appreciate at a faster rate than will the particular class in general." *Bailey,* 904 F.2d at 924 (quoting J. LONG, BLUE SKY LAW § 2.03[2][d][iii], at 2–45 to 2–46 (1986)). Since in these cases the realization of profits depends significantly on what happens in the market for that type of item, the investment would not constitute a security.

Given the paucity of cases where pre-purchase managerial activities of the promoter alone are likely to create a security, my fear

that the majority's approach will unduly restrict the flexibility of the *Howey* test might appear exaggerated. On the other hand, the difficulty with illustrating the restrictive effects of the majority's bright-line approach could be seen as a very good reason to preserve flexibility, for flexibility is what allows us to adapt our existing securities laws to address "novel schemes," schemes that we cannot easily anticipate ahead of time. At the very least, surely we should heed the concerns of the SEC, which bears primary responsibility for administering the securities laws. In its brief the SEC has urged us not to draw "a sharp line between those efforts occurring at or around the time of the investment of money, and those occurring thereafter" for fear that such a line would create a loophole in the securities laws that promoters could exploit. Appellee Br. at 41; *see also Forman*, 421 U.S. at 858 n. 25, 95 S.Ct. at 2063 n. 25 (noting that the views of the SEC would have been given considerable weight had the agency's position been consistent); *SEC v. R.G. Reynolds Enters., Inc.*, 952 F.2d 1125, 1132 n. 7 (9th Cir.1991)("[w]hile the SEC's view is not conclusive, it is entitled to substantial weight").

LPI's viatical settlements represent one of the rare instances where investor profits depend predominantly on the pre-purchase managerial activities of a promoter. As the district court found, whether investors realize the profits they expect depends on whether LPI's estimation of the insured's life span is accurate. The longer the insured remains alive, the lower the investors' profits, particularly if premiums must continue to be paid. Moreover, the record clearly supports the district court's finding that investors rely on LPI's evaluation of the insured's life expectancy. LPI emphasizes the detailed assessment of the insured's medical condition that it performs in its promotional materials. LPI, Commonly Asked Questions (January, 1993), *reprinted in* JA–II 1342–43. While the T-cell count of a person with AIDS is an important indicator of life expectancy, LPI's reviewing physician testified that he bases his life expectancy estimates on several other factors as well, such as incidence of opportunistic infection, platelet count, pulmonary studies, *etc.* Testimony of Dr. John Kelly,

*reprinted in* JA–II 1361. Potential advances in the treatment of AIDS must also be taken into account. *Id., reprinted in* JA–II 1360–61. Although investors can ask for a copy of the report on the insured's medical condition filed by LPI's reviewing physician, they can only review the medical information supplied by the insured and the insured's physician in LPI's offices. Testimony of Brian Pardo, *reprinted in* JA–IIIB 3088–89 ("Pardo Testimony"). Nor do they have any access to medical information on the insured beyond that obtained by LPI. Under a recently adopted Texas regulation, which governs LPI's viatical settlements, only a viatical settlement company or broker can contact an insured about the insured's health status. TEX. ADMIN. CODE tit. 28, § 3.10012 (1996); *see also* 21 Tex. Reg. 1124 (1996)(noting adoption of new regulations on viatical settlements). In any event, given the technical and complicated nature of this medical information, few investors are likely to be able to assess the reliability of LPI's life expectancy estimate.

Two other key variables affecting investor profits are the price that LPI negotiates for the sale of the policy and whether the policy is freely assignable. LPI's former president, Brian Pardo, testified that investors do not participate in price negotiations because the policy is not offered to investors for purchase until the seller and LPI have agreed on a price. Pardo Testimony, *reprinted in* JA–IIIB 3079. Investors thus rely on LPI, with its familiarity with going rates and prominence as a major viatical company, to obtain a favorable purchase price. Any delay in obtaining benefits after the insured dies, for example if a former beneficiary or the insurance company challenges the assignment, cuts into profits. Hence, LPI's services of investigating policies, drafting valid assignment contracts, and arranging if necessary for former beneficiaries to agree to the assignment, is also very important. Commonly Asked Questions, *reprinted in* JA–II, 1343–44; Report of Compliance Efforts, *reprinted in* JA–S 4124. In addition, policy sellers in some states may have enhanced protections and revocation rights, and some states may not recognize the purchase of policies by

persons without an insurable interest. LPI, Draft Private Placement Memorandum for Life Partners Ltd, *reprinted in* JA–IIIB 3019. As a result, investors must rely on LPI's knowledge of insurance laws in the different states and LPI's tracking of proposed legislation affecting viatical settlements.

Market forces, however, do not play a significant role in determining whether profits are realized. Their only effect is indirect, in that market forces determine whether investment in policies is profitable compared to other investments. An investment in a life insurance policy might yield a less favorable rate of return than an alternative investment keyed to interest rates if interest rates were to rise dramatically. But this effect on profits is insignificant compared with the effect that LPI's life expectancy evaluation and other services have, and it is also in no way unique to viatical settlements. Every investment is subject to becoming less profitable because of background economic developments. In addition, while the course of the insured's illness determines when the insured dies, the realization of expected investor profits depends not on the timing of the insured's death *per se* but rather on whether the death occurs within the period estimated by LPI.

All of the activities performed by LPI occur pre-purchase, and as a result the majority holds that LPI's viatical settlements do not create an investment contract. Under my approach, since the investors' profits depend entirely on managerial activities of the promoter, the *Howey* test is met and LPI's viatical settlements should be subject to the securities laws. The fact that no investor appears to have been "defrauded, misled, or is in any way dissatisfied with an LPI viatical settlement," Maj. op. at 539, does not make this result unreasonable. The securities laws are intended to be prophylactic and prevent abuses before they arise. Even if LPI's practices are legitimate there is no guarantee that those of other viatical settlement brokers will be similarly above board. Moreover, there are indications that the viatical settlement industry will grow substantially in coming years, as companies begin to purchase policies from individuals terminally ill from cancer as well as AIDS. *See* Pamela Sherrid, *Enriching the Final Days*, U.S. NEWS & WORLD REP., Aug. 21, 1995 at 56, *reprinted in* JA–IB 483; Keith Stone, *Brokers, Terminally Ill Turning Death Into Cash*, L.A. DAILY NEWS, Oct. 25, 1992 at N1, *reprinted in* JA–II 1287–91. A significant jump in viatical sales is also expected to occur if Congress enacts legislation to clarify that the income from the sale of a life insurance policy is not taxable to the insured, as it is currently considering doing. *See* Albert B. Crenshaw, *Tackling an Issue of Agony*, WASH. POST, Sept. 1, 1995, at C1, C3, *reprinted in* JA–4145. The securities laws are the only currently existing regulatory scheme by which investors in viatical settlements can be protected. Although several states have enacted laws dealing with viatical settlements, these laws only protect the insured who is selling the policy and not the investor who is purchasing it. *See, e.g.,* N.Y. INS.LAW §§ 7801–7810 (McKinney's Supp.1996); *see generally* VIATICAL SETTLEMENTS MODEL ACT, *reprinted in* JA–II 1073–88.

It is also important to bear in mind that the majority's bright-line rule will apply to all investments, not just viatical settlements. An illustration of the restrictive effect that this rule could have in other contexts can be drawn from the recent problems associated with derivatives. A derivative is a financial contract, arranged through a dealer, that derives its value by reference to an underlying asset, interest rate, exchange rate or index.[2] *See* Geoffrey B. Goldman, *Crafting a Suitability Requirement for the Sale of Over–the–Counter Derivatives: Should Regulators "Punish the Wall Street Hounds of Greed"?*, 95 COLUM. L.REV. 1112, 1116–19 (1995). Some derivatives are traded on the

---

2. An example of a derivative contract is when two parties enter into an interest-rate swap: one party agrees to pay the other a fixed rate of interest applied to some dollar amount while the other agrees to pay a variable interest rate on the same amount. Depending on whether interest rates rise or fall, one party will pay the other the difference between the two measures when payments are due, but there is no exchange of the underlying dollar amount. *See* John C. Hull, OPTIONS, FUTURES, AND OTHER DERIVATIVE SECURITIES 111–16 (1993).

organized exchanges, such as the stock and commodities exchanges, but a growing portion are not; the total outstanding amount of these non-exchange derivatives, denominated "over-the-counter" derivatives, was $43.2 trillion at the end of 1995, up 17% from the $36.9 trillion outstanding at the end of 1994. *See* Samer Iskandar, *Survey—International Capital Markets '96: A Blip in the Growth Trend,* FIN. TIMES, June 10, 1996, at 7. The growing prominence of over-the-counter derivatives and the spectacular losses suffered by some investors, such as Orange County, have sparked concern that derivatives may be insufficiently regulated. *See* Goldman, supra, at 1119–25; J. Christopher Kojima, *Product–Based Solutions to Financial Innovation: The Promise and Danger of Applying the Federal Securities Laws to OTC Derivatives,* 33 AM. BUS. L.J. 259, 261–63 (1995). What regulatory options are currently available in regard to derivatives is a source of debate, and commentators disagree in particular as to whether derivatives meet the common enterprise and expectation of profits from the efforts of others requirements of the *Howey* test so as to qualify as investment contracts. *Compare Procter & Gamble Co. v. Bankers Trust Co.,* 925 F.Supp. 1270, 1278 (S.D.Ohio 1996) *with* Kojima, supra, at 298–304. But it is at least possible to imagine a type of derivative arrangement that would meet the *Howey* requirements as they have existed up to now. For example, a dealer could organize a complex set of derivative transactions for a group of investors with the aim of adopting offsetting positions in different markets that would generate a certain percentage of return. The realization of profits in this situation depends predominately on the dealer's expertise in balancing positions in different markets against one another rather than on what happens in a particular market. Consequently, this type of derivative arrangement could qualify as an investment contract under the approach I have outlined, but it could not so qualify under the majority's. Since the significant managerial activity of the derivative dealer——the selection and structuring of the derivative instrument and the investigation of the parties' financial status—usually occurs before the parties enter into the transaction, the majority's approach would prevent most derivative transactions from ever constituting investment contracts. As a result, the majority's approach could seriously hamper regulators as they seek to determine how best to treat this burgeoning class of financial instruments.

I believe that the majority's position, precluding pre-purchase managerial activities of a promoter from ever satisfying the third prong of the *Howey* test, is unwarranted and will serve to undercut the necessary flexibility of our securities laws. An approach that allows pre-purchase activities of the promoter to satisfy the third prong when the realization of investors' profits depends predominantly on these activities offers a means of distinguishing between ordinary investments and securities that both better conforms to precedent and has a less restrictive effect on the securities laws. Therefore, I respectfully dissent.