**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**FRIENDLY POWER COMPANY LLC, Friendly Power Company, Inc., Friendly Power Franchise Company, Scott J. Levine, Sabrina Levine, and Dwight H. Stephens, Defendants,**

**Rich Holdings, Inc., Rich Management, Inc., Cyber–Tech Marketing & Consulting, Inc., and Packard Energy Group, Inc., Relief Defendants.**

**No. 98–2902–CIV.**

United States District Court, S.D. Florida.

May 12, 1999.

Mitchell Herr, Miami, FL, for plaintiff.

David Garvin, Miami, FL, for defendants.

## FINAL JUDGMENT

JAMES LAWRENCE KING, District Judge.

THIS CAUSE comes before the Court on the non-jury trial in the above-styled matter, held from April 6, 1999 through April 9, 1999. The Court has heard testimony and reviewed evidence on the issues of liability and relief, and makes the following findings of fact and conclusions of law.

### I. Findings of Fact

1. The Court has subject matter jurisdiction over the above styled matter pursuant to Sections 20(b), 20(d), and 22(a) of the Securities Act of 1933 ("Securities Act"). *See* 15 U.S.C. §§ 77t(b), 77t(d), 77v(a) (West 1998).

2. Venue is proper in the Southern District of Florida both because some of the acts and/or transactions giving rise to the SEC's action occurred in this District and because Defendants reside within this District.

3. Plaintiff, the Securities and Exchange Commission ("SEC"), is the federal administrative agency charged by Congress with overseeing securities markets in the United States. In this capacity, the SEC may institute legal action against individuals or entities believed to be violating the Securities Act.

4. Defendants Scott J. Levine ("Scott") and Sabrina Levine ("Sabrina") (collectively, "Levines")[1] reside in Plantation, Flori-

---

1. This Court already has entered Final Judgments against the following Defendants: Friendly Power Company LLC; Friendly

da. In 1996 and 1997, the Levines researched the potential of starting a new utility company in the recently deregulated utility industry in the state of California. In or about April 1997, one or both of the Levines formed Defendant Friendly Power Company LLC ("FPC–LLC"), which eventually became a utility company licensed to operate within the state of California. In the summer of 1997, one or both of the Levines formed Defendant Friendly Power Company, Inc. ("FPC–Inc."). For purposes of this Order, Defendants FPC–LLC and FPC–Inc. will be treated as the same entity. Also during the summer of 1997, one or both of the Levines formed Friendly Power Franchise Company ("FPC–Franchise"), the Articles of Incorporation of which was filed with the Colorado Secretary of State on August 8, 1997. Defendants FPC–LLC, FPC–Inc., and FPC–Franchise (collectively, "Friendly Power") are located in Miami Lakes, Florida.

5. As Chief Executive Officer ("CEO") of FPC–Inc., Defendant Scott sought to obtain electric power at a discount of the going rate charged by the power exchange. In March 1998, FPC–Inc. entered into an Automated Power Exchange Service and Participation Agreement with Automated Power Exchange, Inc. ("APX"). APX operates an electrical power exchange from which FPC–Inc. can buy electrical power at APX market prices. As CEO of FPC–Inc., Defendant Scott also was responsible for advertising the name and services of Friendly Power throughout the state of California in order to establish name recognition for the company.

6. FPC–Franchise entered into a contract with FPC–Inc. under which FPC–Franchise was granted the exclusive license to franchise operators to convert residential customers to Friendly Power. In exchange therefor, FPC–Franchise was to give FPC–Inc. ninety percent (90%) of all gross sales from the sales of franchises.

Defendant Sabrina served as the President and sole owner of FPC–Franchise.

7. FPC–Franchise priced franchises for resale at two dollars ($2.00) per household converted in the franchise's exclusive geographical territory. Each franchise was assigned a protected geographical territory, determined by number of residential households, competition from other service providers, and various other demographics. Each franchise was required to achieve and maintain a five percent (5%) market share of electric power customers in its protected territory within five (5) years from the date of its Franchise Agreement. In all, FPC–Franchise executed thirty-five (35) Franchise Agreements, with franchises that were priced between $200,000 and $600,000. Ultimately, FPC–Franchise sold seventeen (17) franchises, and canceled four (4) franchises for non-compliance with the Franchise Offering Circular that had been filed with the state of California.

8. Defendant Rich Management, a telemarketing firm, purchased a franchise through a general partnership on credit, and sold units in the partnership to pay for the franchise and make a profit for itself. Defendant Packard Energy Group, Inc., another telemarketing operation, made telephone calls to find investors to buy partnership units in various franchises. These franchises, in which investors were sought by the telemarketing operations, were formed to attempt to get residential customers to convert to Friendly Power; FPC–Inc. did not itself go after any residential customers. In seeking their buyers, the telemarketing operations represented to potential investors that they had to participate in the day-to-day business affairs of the franchise as active investors. Paper Processing, Inc. was responsible for checking the telemarketers' paperwork and calling all investors to ensure that the

Power Company, Inc.; Friendly Power Franchise Company; Cyber–Tech Marketing & Consulting, Inc.; Packard Energy Group, Inc.; Rich Holdings, Inc.; and Rich Management, Inc. This Court has yet to rule on the

SEC's Motion for entry of Default Judgment against Defendant Dwight H. Stephens. Only the Levine Defendants are subject to this Final Judgment.

telemarketers had complied with certain standards.

9. Forty percent (40%) of the investors' funds were to go to Friendly Power, as payment for the purchase price of the franchises. An additional forty percent (40%) of the investors' funds were to go to the telemarketing operations as payment for their services. The remaining twenty percent (20%) of the investors' funds were to be held for future working capital when the franchise broke escrow. Once the franchise broke escrow, the investors would be entitled to fifty percent (50%) of Friendly Power's net profits on sales to residential customers in the franchise territory. Under the initial distribution of investors' funds, however, Defendants notified the investors that they likely would not see a profit for quite some time after their initial investment. In the meantime, Friendly Power could use the investors' funds as capital for its business of providing electrical power to commercial customers in the state of California.

10. Each Friendly Power franchise was to made up of between 50 and 94 partners. Each investor signed a Participation Agreement, which mandated that they be involved in the day-to-day operations of the franchise and actively participate in one or more of the management committees responsible for overseeing and conducting the franchise.

11 Friendly Power began providing electricity to its customers on May 1, 1998. By July 17, 1998, only the San Francisco partnership's franchise had broken escrow. By this time, Friendly Power had received $2.4 million from 308 investors.

12. On July 17, 1998, the SEC caused all of Friendly Power's assets to be frozen, such that Friendly Power no longer could buy power. With its funds frozen and its credit terminated, Friendly Power notified the California Energy Commission on August 8, 1998 that it would no longer be able to provide power to its customers, and they were all changed back to their previous utility provider.

13. On July 17, 1998, the SEC filed its original Complaint against the Defendants, which it later dismissed without prejudice. The SEC re-filed its Complaint on November 24, 1998, of which only Count I— alleging that Friendly Power and the Levines offered unregistered securities for sale to the public in violation of Sections 5(a) and 5(c) of the Securities Act—against the Levines is at issue for purposes of this Final Judgment. The SEC seeks (a) entry of permanent injunctions against the Levines for violations of Sections 5 of the Securities Act, (b) disgorgement from the Levines of their unjust enrichment, and (c) civil money penalties pursuant to Section 20(d) of the Securities Act.

## II. Conclusions of Law

A. SEC's *Prima Facie Case for Establishing the Levines' Violation of the Securities Act* ·

1. Absent an exemption, Section 5 of the Securities Act prohibits any person from selling, or offering to sell, a security in interstate commerce unless a registration statement has been filed with the SEC. *See* 15 U.S.C. §§ 77e(a), 77e(c) (West 1998).

2. In order to establish a *prima facie* case for violation of Section 5, the SEC must show that (1) securities were offered or sold for which no registration statement was filed or in effect; (2) the offering or sale was made through the means or instruments of transportation or communication in interstate commerce or the mails; and (3) defendants, directly or indirectly, offered or sold the securities. *See SEC v. Continental Tobacco Co.,* 463 F.2d 137, 155 (5th Cir.1972).[2] Neither negligence nor scienter is an element of a prima facie case under Section 5 of the Securities Act. *See SEC v. Tuchinsky,* 1992 WL 226302, at *2 (S.D.Fla. June 29,

---

2. The Eleventh Circuit has adopted as binding precedent all Fifth Circuit decisions issued prior to October 1, 1981. *See Bonner v.* *Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

1992) ("[T]he Securities Act imposes strict liability on offerors and sellers of unregistered securities, who are held accountable regardless of whether there was any degree of fault, negligent or intentional."). Furthermore, neither a good faith belief that the offers or sales in question were legal, nor reliance on the advice of counsel, provides a complete defense to a charge of violating Section 5 of the Securities Act. *See, e.g., SEC v. Holschuh,* 694 F.2d 130, 137 n. 10 (7th Cir.1982); *SEC v. Savoy Indus., Inc.,* 665 F.2d 1310, 1314–15 n. 28 (D.C.Cir.1981).

3. The Court now will turn to its analysis of whether the SEC has established the aforementioned three elements, thereby making its *prima facie* case that the Levines violated Section 5 of the Securities Act.

B. *Investments as Securities Offered or Sold with No Registration Statement*

1. Section 2(1) of the Securities Act defines a "security" as "any note, stock, treasury stock, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, [or] investment contract...." 15 U.S.C. § 77b(a)(1) (West 1998).

██ 2. Economic substance, not form, governs whether a given investment is a security. *See Stowell v. Ted S. Finkel Inv. Servs., Inc.,* 489 F.Supp. 1209, 1224 (S.D.Fla.1980). ("[T]he securities laws are to be applied in light of the economic realities of a transaction, with the substance of the transaction elevated over the form of the investment. As stated in *Howey* and *Koscot,* the security standard must be a resilient standard, one which is capable of adapting to various and creative schemes devised by promoters who seek to use the money of others.").

3. A security may include a scheme through which a novel device is widely offered or dealt with under terms or a course of dealing that establishes its character in commerce as an interest or instrument commonly known as a security. *See SEC v. C.M. Joiner Leasing Corp.,* 320 U.S. 344, 351, 64 S.Ct. 120, 88 L.Ed. 88 (1943).

4. To determine whether the partnership units in Friendly Power franchises purchased by individuals contacted by the telemarketing operations qualify as securities, the Court will apply the *Howey/Forman* test.

1. *Investments as Investment Contracts Under the Howey/Forman Test*

██ 5. The Supreme Court initially defined an "investment contract" as a contract, transaction, or scheme whereby a person makes an investment of money in a common enterprise and is led to expect profits solely from the efforts of a promoter or a third party. *See SEC v. W.J. Howey Co.,* 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). The Supreme Court later modified this definition to require that the promoter contribute only the "entrepreneurial or managerial efforts." *United Housing Foundation, Inc. v. Forman,* 421 U.S. 837, 852, 95 S.Ct. 2051, 44 L.Ed.2d 621 (1975). Therefore, under the *Howey/Forman* test, an investment contract exists if there is (a) an investment of money, (b) in a common enterprise, (c) based on an expectation of profits to be derived from the entrepreneurial or managerial efforts of others.

██] 6. The Court now must analyze whether the facts before it warrant a conclusion that the investments made in this case satisfy the three *Howey/Forman* elements, thereby qualifying as investment contracts.

a. Investment of money

7. An "investment of money" refers to an arrangement whereby an investor commits assets to an enterprise or venture in such a manner as to subject himself to

financial losses. *See Stowell,* 489 F.Supp. at 1220.

8. In the case at hand, 308 investors invested $2.4 million into Friendly Power, through its franchises. Since Defendants made clear that Friendly Power and its franchises likely would be subject to significant losses at least in the first few years of operation, the Court concludes that the investors clearly committed a significant amount of assets to a scheme that could subject them to financial losses. As such, their investments satisfy the first element of the *Howey/Forman* test.

b. Common enterprise

9. The Eleventh Circuit Court of Appeals has defined a "common enterprise" as a relationship in which "the fortunes of the investor are interwoven with and dependent upon the efforts and success of those seeking the investment or of third parties." *Villeneuve v. Advanced Bus. Concepts Corp.,* 698 F.2d 1121, 1124 (11th Cir.1983) (citation omitted). Similarly, the former Fifth Circuit, noted that "the requisite commonality is evidenced by the fact that the fortunes of all investors are inextricably tied to the efficacy of the [promoters]." *SEC v. Koscot Int'l, Inc.,* 497 F.2d 473, 479 (5th Cir.1974).

10. In this case, the investors were entitled to 50% of Friendly Power's net profits on sales to residential customers in the franchise territory. However, the investors clearly were dependent upon the efforts of others in order to achieve any sales through which to gain on their investment. They depended first upon Friendly Power and the Levines to maintain a source of utility power. More important, they depended heavily on the telemarketing operations; if the telemarketers were unable to convert 5% of the franchise territory's residential customers to Friendly Power within five years, the investors not only would reap no profits, but also likely would not even recoup their initial investment. The Court therefore concludes that the investments in this case satisfy the second requirement of the *Howey/Forman* test.

c. Profits from the efforts of others

11. Courts have interpreted the third *Howey/Forman* requirement to demand an inquiry into "[w]hether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *Stowell,* 489 F.Supp. at 1222–23, *citing Koscot Int'l,* 497 F.2d 473 (5th Cir.1979).

12. In this case, since the investments took the form of partnership units, the Court must analyze the partnership structure in order to determine whether or not the investors/partners were dependent on the efforts of others for the effective exercise of their partnership powers.

13. Courts have held that units in general partnerships are not investment contracts within the ambit of the Securities Act. *See, e.g., Banghart v. Hollywood Gen. Partnership,* 902 F.2d 805, 808 (10th Cir. 1990); *Hocking v. Dubois,* 885 F.2d 1449, 1462 (9th Cir.1989); *Rivanna Trawlers Unltd. v. Thompson Trawlers, Inc.,* 840 F.2d 236, 240–41 (4th Cir.1988). The former Fifth Circuit Court of Appeals articulated several circumstances that may warrant a court's refusal to apply this general rule. *See Williamson v. Tucker,* 645 F.2d 404, 422 (5th Cir.1981). The *Williamson* court offered the following guidelines:

A general partnership or joint venture interest can be designated a security if the investor can establish, for example, that (1) an agreement among the parties leaves so little power in the hands of the partner or venturer that the arrangement in fact distributes power as would a limited partnership; or (2) the partner or venturer is so inexperienced and unknowledgeable in business affairs that he is incapable of intelligently exercising his partnership or venture powers; or (3) the partner or venturer is so dependent on some unique entrepreneurial or managerial ability of the promoter or manager that he cannot replace the manager of the enterprise or otherwise

exercise meaningful partnership or venture powers.

*Williamson,* 645 F.2d at 424. If the partners have irrevocably delegated their powers, are incapable of exercising them, or are so dependent on the particular expertise of the promoter or manger, then their partnership powers do not give them sufficient control over the partnership. *See Williamson,* 645 F.2d at 422–23. In other words, they become dependent on others for their profits, which is the third element of the *Howey/Forman* test.

14. In deciding whether the investors-partners have control over the partnership, courts considered the partnership agreement, but focus primarily on how the partnership actually operates. As such, this Court first will consider the Partnership Agreement signed by the investors, and then analyze the manner in which the partnerships actually were to operate.

15 Article 7 of the Partnership Agreement, which every investor (called therein a "AP Partner," for "Active Participating Partner") was required to sign, provided as follows:

> The Partnership is not a passive involvement. It is managed by the AP Partners themselves. Each and every AP Partner is required to actively participate in important business management decisions affecting the partnership by exercising their voting power. Each AP Partner will be required to participate in one or more management committees which oversee and conduct Partners business.... By establishing the above committees, each AP Partner shall be involved in some of the day-to-day management of the business of the Partnership and have meaningful input by utilizing its/his/her duties, even if it/he/she may be located at some distance from the business market area. Thus, each AP Partner shall have active control of the Partnership's affairs.... Each AP Partner is required to solicit customers,

to provide names of potential customers or cause solicitation and prospect lists to be provided to the Partnership. Each AP Partner must cause to be provided to the Partnership the names of, or cause to be solicited at least ten customers per month.

The Partnership Agreement seems to indicate that the investors were to supply the essential managerial efforts that would affect the failure or success of the franchise.

16. Notwithstanding the Partnership Agreement, it seems clear that the investors/partners in this case were to perform only ministerial acts and would not exercise any meaningful control over the partnership.

17. The success of the partners' investment depended in large part on Friendly Power (and the Levines as the sole owners thereof) to do the following: (a) advertise and promote the name and services of Friendly Power, (b) sustain a relationship with a source of utility power in the state of California, (c) purchase electricity at a price sufficiently low to allow for profits, and (d) sell electricity at a price sufficiently high to allow for profits.[3] These facts alone, however, are insufficient to cede ultimate control over the partnership to Friendly Power; these characteristics are more endemic to the operation of franchises generally, rather than the way this particular franchising scheme was arranged.

18. With 80% of the investors' funds being split between Friendly Power and the telemarketing operations, the likelihood of each franchise being able to maintain enough working capital to operate at all, let alone generate profits, seems doubtful. Nevertheless, the Court will consider the investors' possible participation in the partnership to determine their degree of control.

19. Although the investors/partners each would serve on at least one commit-

---

**3.** The experience of the San Francisco franchise demonstrates this dependence on Friendly Power. When the company was un-able to continue obtaining electrical power business, the San Francisco franchise was forced to go out of business.

tee, their primary responsibility in the partnership was to convert, or cause to be converted, residential customers in their franchise territory to Friendly Power. To carry out that goal, they planned on hiring a telemarketing firm. The success of their investment then would depend on the telemarketing operation's ability successfully to convert residential customers to Friendly Power. Since they would receive 50% of Friendly Power's net profits from residential utility service in their territory, whether or not the telemarketer was successful in recruiting *residential* customers would determine the investors' profits. However, Friendly Power would definitely profit, using the investors' funds in aid of its business of selling electrical power to *commercial* customers.

20. The efforts of Friendly Power and the telemarketing operations would be crucial even to the long-term possibility of profits to the investors, since the franchise agreements mandate that each franchise achieve and maintain a five percent (5%) market share of electric power residential customers in its protected territory in five (5) years. The Court concludes that the investors/partners could not meaningfully control whether or not their franchise would achieve this objective. Notwithstanding the investors' designation as Active Partners, the scheme in which the Levines were involved seems to have relied on passive individuals to invest for the benefit of Friendly Power and the telemarketing operations.

21. Friendly Power and the telemarketing operations provided all the essential managerial efforts that would affect the failure or success of the franchises in which the investors bought partnership units. Accordingly, the third element of the *Howey/Forman* test has also been met.

### 2. *Securities Were Unregistered*

22. The Defendants concede that they did not register anything with the SEC, as required by Section 5 of the Securities Act.

23. The Court concludes that the SEC has successfully established that securities were offered or sold for which no registration statement was filed or in effect.

### C. *Offer or Sale of Securities Was in Interstate Commerce*

1. The Securities Act prohibits any person from "mak[ing] use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise" or "carry[ing] or caus[ing] to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale." 15 U.S.C. § 77e(a) (West 1998).

2. The telemarketing operations that sold the partnership units contacted potential investors nationwide by telephone, which is an instrument of communication in interstate commerce

3. The Court concludes that the SEC has successfully established that the offering or sale of securities was made in interstate commerce.

### D. *The Levines' Indirect Offer or Sale of the Securities*

1. Section 5 of the Securities Act prohibits "any person, *directly or indirectly*" from selling or offering to sell an unregistered security. *See* 15 U.S.C. §§ 77c(a), 77e(c) (West 1998) (emphasis added). Even where the person or entity does not have individual contact with the purchasers of the securities, that person or entity has indirectly offered or sold that security to the public if he or it has employed or directed others to sell or offer them, or has conceived of and planned the scheme by which the unregistered securities were offered or sold. *See SEC v. Holschuh*, 694 F.2d 130, 140 (7th Cir.1982) ("To hold that proof of direct contact [with investors] is necessary would be to ignore and render meaningless the language of Section 5, which prohibits any person from 'directly or *indirectly*' engaging in the offer or sale of unregistered securities.").

[7] 2. A defendant is liable under Section 5 of the Securities Act if it can be shown that he was a "necessary participant" or a "substantial factor" in the offering or selling of the unregistered securities. *See Holschuh,* 694 F.2d at 139; *see also SEC v. Murphy,* 626 F.2d 633, 649–52 (9th Cir.1980).

■ 3. The Court concludes that the evidence shows that the Levines violated Section 5 of the Securities Act by indirectly engaging in the offer and/or sale of unregistered securities. The Court finds it of no consequence that the Levines may never have had individual contact with the investors. The Levines, as the sole owners of all three Friendly Power entities—clearly were substantial factors in the conception of and planning of the scheme by which partnership units were to be sold in the franchises, such that the securities laws might be avoided. Indeed, the Levines were the necessary participants without which the partnership units could not reasonably be sold; as the exclusive owners of Friendly Power, the Levines controlled the ability of the franchises to obtain utility power to offer residential customers.

## III. Relief

### A. *Permanent Injunction*

■ 1. Section 20(b) of the Securities Act provides that, upon a proper showing, a permanent injunction shall be granted without bond. *See* 15 U.S.C. § 77t(b) (West 1998). As Plaintiffs correctly point out, "[t]he function of a court in deciding whether to issue an injunction authorized by a statute of the United States to enforce and implement congressional policy is a different one from that of the court when weighing claims of private litigants . . . The passage of the statute is in a sense an implied finding that violations will harm the public and ought to, if necessary, be restrained." *United States v. Diapulse Corp. of Amer.,* 457 F.2d 25, 27–28 (2nd Cir.1972).

■ 2. In deciding whether or not to grant injunctive relief, the Eleventh Circuit Court of Appeals mandates consideration of the following factors: (a) the egregious nature of the defendant's actions; (b) the isolated or recurrent nature of the violations; (c) the degree of scienter involved; (d) the sincerity of the defendant's assurances, if any, against future violations; (e) the defendant's recognition of the wrongful nature of his conduct; and (f) the likelihood that the defendant's occupation will present opportunities for future violations. *See SEC v. Carriba Air, Inc.,* 681 F.2d 1318, 1322 (11th Cir.1982).

■ 3. All of the factors identified in *Carriba Air* seem also to exist in the instant case. First, the SEC has presented to this Court a pattern of past and present questionable business practices by the Levines. Second, with respect to Friendly Power, the Levines blatantly and inexcusably violated the securities laws by participating in a scheme through which partnership units in which the partners would have no meaningful control were sold to investors, in order to avoid the securities laws. Third, Defendants knowingly assisted in the making of material misrepresentations to investors, and have taken no action to correct these misrepresentations and omissions. Fourth, the Levines only stopped seeking investors after the SEC initiated this lawsuit. Finally, the Levines presumably will remain in a position where they will have abundant opportunities for future violations of the securities laws.

4. The Court finds that the Levines should be permanently enjoined from directly or indirectly offering or selling unregistered securities in interstate commerce.

### B. *Disgorgement*

■ 1. The remedy of disgorgement is designed both to deprive a wrongdoer of his unjust enrichment and to deter others from violating the securities laws. *See SEC v. Blatt,* 583 F.2d 1325, 1335 (5th Cir.1978). Since the wrongdoer bears the risk of uncertainty as to the enrichment caused by his violation, he amount of dis-

gorgement ordered· by the court "need only be a reasonable approximation of profits causally connected to the violation." *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1231–32 (D.C.Cir.1989)

2. Defendants may be held jointly and severally liable for the disgorgement, if the evidence shows that they both violated the securities laws together as primary violators. *See SEC v. First Jersey Secs., Inc.*, 890 F.Supp. 1185, 1211 (S.D.N.Y.1995)

3. The Levines admittedly owned Friendly Power in its entirety. The Court concludes that the Levines should be jointly and severally liable, with the three Friendly Power entities *and* the telemarketing operations, for the $2.4 million received by investors.

### C. Civil Monetary Penalties

1. Section 20(d)(1) of the Securities Act authorizes a district court to impose, upon a proper showing, a civil penalty to be paid by person(s) found to have violated the Securities Act. *See* 15 U.S.C. § 77t(d)(1) (West 1998). The amount of the penalty is to be determined by the court in light of the facts and circumstances. *See id.* at § 77t(d)(2)(A).

2. The Securities Act establishes three tiers of penalties. For each violation, the first tier allows for a penalty not to exceed the greater of (i) $5000 for a natural person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation. *See id.* If the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, the second tier allows for a penalty for each such violation not to exceed the greater of (i) $50,000 for a natural person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation. *See id.* at § 77t(d)(2)(B). Finally, if (a) the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and (b) the violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to oth-

er persons, the third tier allows for a penalty for each such violation not to exceed the greater of (i) $100,000 for a natural person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation. *See id.* at § 77t(D)(2)(C).

3. The Court concludes that each of the Levine Defendants should pay a civil monetary penalty of $100,000. Their violation of the securities laws involved a deliberate scheme through which they sought investors in such a way as to avoid the securities laws. As the Court discussed above, their failure to register their securities with the SEC created a substantial risk that the investors would lose their investments.

### D. Rulings of the Court

Accordingly, after a careful review of the record and the Court being otherwise fully advised, it is

ORDERED and ADJUDGED that Final Judgment be, and the same is hereby, ENTERED in favor of Plaintiff Securities and Exchange Commission and against Defendants Scott J. Levine and Sabrina Levine. It is further

ORDERED and ADJUDGED that Defendants Scott J. Levine and Sabrina Levine, their agents, servants, employees, attorneys, and those persons in active concert or participation with them be, and the same are hereby, PERMANENTLY ENJOINED from directly or indirectly (a) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell securities in the forms of units, common stock, warrants or any other securities (including, but not limited to, interests in limited liability partnerships), through the use or medium of any prospectus or otherwise, unless and until a registration statement is in effect with the SEC as to such securities; (b) carrying securities, in the form of units, common stock, warrants or any other securities (including, but not limited to, interests in

limited liability partnerships), or causing them to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale, unless and until a registration statement is in effect with the SEC as to such securities; or (c) making use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy, through the use or medium of any prospectus or otherwise, any securities, in the form of units, common stock, warrants or any other securities (including, but not limited to, interests in limited liability partnerships), unless a registration statement is filed with the SEC as to such securities, or while a registration statement filed with the SEC as to such security is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under Section 8 of the Securities Act, in violation of Sections 5(a) and 5(c) of the Securities Act, provided, however, that nothing in the foregoing portion of this injunction shall apply to any security or transaction which is exempt from the provisions of Section 5 of the Securities Act. It is further

ORDERED and ADJUDGED that Defendants Scott J. Levine and Sabrina Levine be, and the same are hereby, DISGORGED, with pre-judgment interest, of all ill-gotten profits or proceeds that it received as a result of the acts or courses of conduct described in the Complaint. The Court finds that Defendants Scott J. Levine and Sabrina Levine should be jointly and severally liable—with Defendants Friendly Power Company, LLC, Friendly Power Company, Inc., and Friendly Power Franchise Company, as well as with Relief Defendants Cyber–Tech Marketing & Consulting, Inc., Packard Energy Group, Inc., Rich Holdings, Inc., and Rich Management, Inc.—for the total value of funds received from the investing public ($2,400,-000.00), less any distributions made by the Receiver to investors. It is further

ORDERED and ADJUDGED that Defendants Scott J. Levine and Sabrina Levine be, and the same are hereby, CIVILLY PENALIZED in the amount of $200,000.00 [$100,000.00 each] in civil monetary penalties, pursuant to Section 20(d) of the Securities Act.

DONE and ORDERED at the James Lawrence King Federal Justice Building and United States District Courthouse, Miami, Florida, this 12th day of May, 1999.