**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**ALPHA TELCOM, INC., an Oregon Corporation; American Telecommunications Company, Inc., a Nevada Corporation; Strategic Partnership Alliance, LLC, a Nevada Limited Liability Company; SPA Marketing, LLC, a Nevada Limited Liability Company; Paul S. Rubera; Robert A. McDonald; Ross S. Rambach; and Mark E. Kennison, Defendants.**

**Civil Action No. CV 01–1283 PA.**

United States District Court, D. Oregon.

Feb. 7, 2002.

Karen Matteson, Securities and Exchange Commission, Los Angeles, CA, for Plaintiff.

Christian A. Hatfield, Robert C. Weaver, Jr., Garvey Schubert & Barer, Portland, OR, for Defendant Paul S. Rubera.

David R. Zaro, Allen Matkins Leck Gamble & Mallory LLP, Los Angeles, CA, for Receiver.

## OPINION

PANNER, District Judge.

Plaintiff Securities and Exchange Commission (SEC) brings this action against Paul S. Rubera (Rubera), alleging he violated the securities registration provisions and antifraud provisions of the Securities Act of 1933, and the antifraud provisions of the Securities and Exchange Act of 1934. Following a bench trial on the merits of this case, I now issue my findings of fact and conclusions of law in accordance with Federal Rule of Civil Procedure 52(a).[1]

### FINDINGS OF FACT

*A. Introduction*

Rubera is the sole owner of Alpha Telcom, Inc. (Alpha). Alpha started in 1986 as a company that sold, installed and maintained telephones and business systems in Grants Pass, Oregon. Sometime in 1997, Rubera was approached by Charles Tummino about a business idea. Tummino's idea was to sell payphones to individuals who would then enter into a service agreement with Alpha to install, service, and maintain the payphones.

Rubera consulted with Alpha's attorney Dan Lacy about the idea. In particular, Rubera wanted to know whether the arrangement would constitute a security. Lacy issued an opinion letter concluding the arrangement was not a security. Lacy also sought an outside legal opinion from Florida attorney Jim Leone who specialized in securities. Leone also concluded the business idea would not constitute the sale of a security. Rubera was given the green light from his attorneys to go forward with the deal. With that advice, Alpha began selling pay telephones, along

---

1. Any finding of fact more properly characterized as a conclusion of law, and any conclusion of law more properly deemed a finding of fact, should be so construed.

with service contracts, to individual investors (the "payphone program").

## B. The Payphone Program

To invest in the payphone program, investors would enter into two agreements: (1) a $5,000[2] per phone purchase agreement; and (2) a service agreement with Alpha to manage the phone. The two agreements were presented and promoted simultaneously. Although investors were given the choice of using a company other than Alpha to manage the phone, approximately ninety percent of investors picked Alpha to service their phones.

Alpha offered four levels of service contracts. Most investors did not have the experience or knowledge necessary to operate and maintain the phones, so they selected the Level Four Service Agreement that required Alpha to perform all necessary services. Investors who selected the Level Four agreement had no involvement in the operation of the payphone. Alpha selected the location of the phone, installed the phone, obtained all certifications from regulatory bodies, maintained and cleaned the phone, paid all monthly telephone and utility bills, and collected the revenue.

With the Level Four service agreement, investors were allowed to sell the phones back at the original price after thirty-six months (or with a penalty before thirty-six months). This is referred to as the "buyback" provision. Beginning sometime after May 2000, investors were also given the option of purchasing buyback insurance. The insurance would cover the investor's purchase price if for some reason the company became unable to repurchase the phones.

The Level Four service agreement also provided that investors were to receive thirty percent of the net revenue from the phone, while Alpha was to receive seventy percent as a monthly fee. However, if revenues from the phone did not generate a base amount of $58.34 in any given month (which amounts to a fourteen percent return on a $5,000 investment), Alpha agreed to waive a portion of its seventy percent fee to maintain that monthly base payment. If Alpha waived its entire fee and the base amount still was not met, Alpha made up the difference. Indeed, Alpha created a computer program that automatically paid each investor the base amount each month, regardless of whether the investor's particular phone generated enough revenue to pay that amount.

## C. Growth of the Business

Initially, Tummino was in charge of marketing and sales for the payphone program. Tummino hired and oversaw a small sales force of independent contractors to solicit buyers for the program. Tummino created the marketing materials used by sales agents, and he also prepared the sales agreement and Alpha service agreement that the agents presented to buyers. These materials were reviewed and approved by Lacy, and Rubera had little understanding or knowledge about the materials.

In October 1998, American Telecommunications Company, Inc. (ATC) was created.[3] Tummino operated ATC as the marketing and sales arm of the payphone program, while Alpha's focus was on obtaining phone sites, installation, service and management of the phones.

---

**2.** When the program first began, some phones were sold for $4,000.

**3.** Until July 2000, ATC was a wholly owned subsidiary of Alpha. In July 2000, the shares were transferred to Rubera. In September 2000, Rubera sold his shares to Julie Fingerson, but Fingerson transferred the shares back in April 2001. Rubera then sold the shares to Robert McDonald.

Tummino retired in late 1998. Before doing so, he introduced Rubera and Lacy to Ross Rambach and Mark Kennison. Rambach and Kennison owned a company called Strategic Partnership Alliance, LLC (SPA), which was in the business of selling programs like that offered by ATC and Alpha. Both Rambach and Kennison had a history of disciplinary actions taken against them by federal and state securities regulators. Rubera was unaware of that history.

Based on Tummino's recommendation, SPA was hired in early 1999 as an independent marketing and sales firm for ATC. Thereafter, SPA was responsible for hiring, training and supervising the sales agents who were marketing the payphone program. SPA also modified the sales materials that were initially prepared by Tummino. Although all modifications to the sales materials were supposed to be approved by Alpha and ATC's counsel before use, SPA did not always follow that direction. After SPA came on board, ATC remained as a processing center for the payphone program while Alpha continued to perform the service and maintenance of the pay phones.

By all accounts, Alpha was a poorly run business. Inventory and accounting systems were inferior and key personnel were inexperienced or incompetent. In 2000 and 2001, the company experienced cash flow problems, and Alpha borrowed money from ATC to pay its expenses.

Despite Alpha's inefficiencies, the business was rapidly growing. By early Fall 2000, Alpha could not keep up with the demand for acquiring new phone sites. Rambach suggested to Alpha that it hire an outside company to acquire new sites so Alpha could focus on installation, service, and maintenance. Rambach recommended a company called ATMN/EMI to acquire the new phone sites. Rubera took Rambach's advice and hired ATMN/EMI.

Rubera did not know that Rambach and Kennison were principals of ATMN/EMI.

ATMN/EMI did acquire new phone sites for Alpha. However, within a few months Alpha discovered that many of the sites were worthless. They obtained sites in burned out buildings or in locations not suitable for pay telephones. In some instances, the locations did not even exist. Alpha terminated its relationship with ATMN/EMI in December 2000 when it discovered these problems.

At the same time ATMN/EMI was procuring worthless sites, SPA salespersons were encouraging existing investors to cash-in on their buy-back options, then in turn reselling new phones to these existing investors. The incentive was particularly appealing to investors who purchased their phones before buyback insurance was available. The investors would exercise their buyback option, then some would immediately reinvest in new phones with buyback insurance. The result was extra commissions to SPA, but it created an overwhelming administrative and financial burden on Alpha.

### D. Buyback Insurance

The buyback insurance was the brainchild of Rambach and Kennison. In early 2000, Rambach and Kennison began trying to persuade Alpha or ATC to fund an insurance policy to sell to investors. Kennison believed the insurance policy would greatly increase sales because investors would have an extra sense of security in their purchase. After much prodding by Rambach and Kennison, the buyback insurance was added to the program, and was funded by ATC.

Robert Harrison is an acquaintance of Rambach and Kennison. Harrison is an insurance salesman in Richmond, Texas. Harrison created Northern & Western Insurance Company (N&W) to insure the

first two million dollars in claims. ATC was to maintain an account, known as the "sinking fund," with two million dollars for the initial claims. ATC also paid premiums to Harrison so he could procure excess insurance.

Harrison procured excess insurance to cover claims in excess of the initial two million dollars. Harrison led the parties to believe that Lloyd's of London was the excess insurer, when it was not. Based on Harrison's representations, Alpha or ATC advertising had indicated that the excess insurer was Lloyd's of London. The excess insurers were in fact British A-plus rated carriers. Once the mistake was discovered, Alpha immediately sent a letter to investors acknowledging and correcting the mistake.

Harrison, his wife, and Rubera were each one-third owners of N&W. However, Rubera never met Harrison, and the two have only spoken on the phone twice as participants in conference calls. Harrison's directions came primarily from Rambach, Kennison, their attorney Walter Theis, and ATC's attorney Michael Cougar. No claims have ever been paid from the buyback insurance.

### E. Alpha's Financial Status

A Receiver was appointed by this Court in September 2001 to take over operations of Alpha, and to investigate Alpha's financial condition. The Receiver's accountant, Christopher Barclay, examined the payphone program and determined it had been operating at a loss. From July 1, 1998 through June 30, 2001, Alpha's payphone program failed to generate revenue sufficient to cover the cost of phone charges and site commissions. Direct expenses for the payphone program for that time were $21,798,000, while revenues were $21,698,000. Accordingly, Alpha's revenues from the payphone program were $100,000 less than the direct cost of operating its payphones. Notwithstanding the loss from its payphone program, Alpha paid investors approximately $17.9 million in returns.

Barclay's analysis for July 1, 2000, to June 30, 2001, reveals that the direct expenses in the operation of the payphone program totaled nearly $12 million, but the total operating income from the payphone program was $11 million. Accordingly, Alpha had a loss for the payphone program during that time of approximately $1 million.

Investors in the payphone program were obviously overpaid, and were not paid in accordance with the revenue generated from each particular payphone. To meet the payment obligations Alpha had created for itself, it borrowed money from ATC. ATC's only source of revenue was money from new investors. It follows, then, that payments made by Alpha to existing investors came from the sale of phones to new investors.

As previously mentioned, Rubera is certainly not a sophisticated businessman. He did not separate the payphone program's expenses and income from the other expenses and income of Alpha. Although Rubera was aware of Alpha's cash flow problems, he did not appreciate Alpha's financial troubles until sometime in April 2001 when the buyback demand had sharply increased.

Rubera did seek advice from Perkins & Co. accountants in 1998 and 1999. At that time, Rubera wanted better and more accurate information about the financial status of Alpha. Alpha had been treating the income from new sales as income rather than a liability. Perkins & Co. advised that because of the buyback provision, the income should be recorded as a liability. Rubera was shocked to learn that the income would be treated differently for taxes than for the company's financial state-

ments. It was clear that Rubera also did not fully understand the program's buyback provision. Ultimately, Rubera decided to consistently report the money as income on both the taxes and the financial statements. A footnote was inserted on the financial statements indicating the reason for treating the money as income rather than a liability.

### F. Alpha Stops Doing Business

In July 2001, after evidentiary hearings, state securities regulators in Ohio decreed that the payphone program constituted sales of securities. As a result, Alpha and ATC immediately stopped accepting sales obtained by SPA. Alpha filed for bankruptcy in August 2001.

## CONCLUSIONS OF LAW

### A. Unregistered Sale of Securities—Section 5 Violations

█ Sections 5(a) and 5(c) of the Securities Act of 1933 forbid the unregistered offer or sale of securities in interstate commerce. The statutory provisions provide as follows:

**(a) Sale or delivery after sale of unregistered securities**

Unless a registration statement is in effect as to a security, it shall be unlawful for any person, directly or indirectly—

(1) to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to sell such security through the use or medium of any prospectus or otherwise; or

(2) to carry or cause to be carried through the mails or in interstate commerce, by any means or instruments of transportation, any such security for the purpose of sale or for delivery after sale.

\* \* \* \* \* \*

**(c) Necessity of filing registration statement**

It shall be unlawful for any person, directly or indirectly, to make use of any means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy through the use or medium of any prospectus or otherwise any security, unless a registration statement has been filed as to such security, or while the registration statement is the subject of a refusal order or stop order or (prior to the effective date of the registration statement) any public proceeding or examination under section 77h of this title.

15 U.S.C. § 77(a), (c). There is no scienter requirement under Section 5. *SEC v. Thomas D. Kienlen Corp.*, 755 F.Supp. 936, 939 (D.Or.1991).

It is beyond dispute that the payphone program has never been registered with the SEC, and the instruments of communication, transportation, and the mails, were used. The elements that Rubera contend are at issue are: (1) whether the payphone program is a security; and (2) whether Rubera was sufficiently involved in the sale or offering. I conclude that the program is a security, and Rubera's involvement was sufficient to render him liable under Section 5.

### 1. Defining a Security

█ The payphone program is an investment contract which is a security as defined in Section 2(a)(1) of the Securities Act. An investment contract involves: (1) an investment of money; (2) in a common enterprise; (3) with the expectation of profits to be derived from the efforts of others. *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298–99, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946). All of these elements are clearly met.

### a. An Investment of Money

■ The first element of *Howey* is met. The investors make cash investments with the expectation of receiving profits.

Rubera contends that *SEC v. Life Partners,* 87 F.3d 536 (D.C.Cir.1996), somehow changed, modified, or clarified the investment element. Rubera is wrong. If anything, *Life Partners* supports the opposite conclusion. *Life Partners* involved the sale of viatical settlements. In discussing the investment element, *Life Partners* distinguished between consumer purchases and purchases made with the expectation of a return on an investment, the latter of which satisfies *Howey. Life Partners,* 87 F.3d at 543. Here, the investors in the payphone program were interested in the steady, monthly income they believed the program would generate. There is no evidence that any of the investors wanted the payphones for their personal use. Accordingly, *Life Partners* does not change the analysis of this element of *Howey.*

### b. A Common Enterprise

■ The second element of the *Howey* test can be satisfied by the existence of either vertical commonality or horizontal commonality. *SEC v. R.G. Reynolds Enterprises, Inc.,* 952 F.2d 1125, 1130 (9th Cir.1991). Vertical commonality is the dependence of the investors' fortunes on the success or expertise of the promoter. Horizontal commonality is the pooling of investor funds and interests. *Brodt v. Bache & Co., Inc.,* 595 F.2d 459, 460 (9th Cir.1978). Both vertical and horizontal commonality exist in this case.

■ Vertical commonality clearly exists. Investors relied on the expertise of Alpha to negotiate and lease sites for the phones, to establish service lines for the phones, and to make all business decisions related to the operation of the phones. Alpha also serviced and maintained the phones, which was important to these investors who had no expertise in the workings of telephones and no desire to maintain or service the phones. In addition, one indicator of vertical commonality is an arrangement to share profits on a percentage basis between the investor and the seller. *Reynolds,* 952 F.2d at 1130–31. Here, with a Level Four service agreement, the investor would receive 30% of the gross receipts, and Alpha would keep 70% of the receipts.

■ Horizontal commonality also exists. ATC loaned money to Alpha. Alpha did not earmark that money for a particular purpose, and it was clearly used, at least in part, to make payments to existing investors. ATC's only source of revenue was money from new investors. As a result, new investor money was being used to pay returns to existing investors. Other evidence of horizontal commonality exists in that Alpha did not pay its investors according to the revenue generated by individual payphones. Investors would receive their fourteen percent return of $58.34 per month regardless of whether their particular phone actually generated that much money during the month.

### c. Expectation of Profits to be Derived From Efforts of Others

■ The issue for this element is whether the efforts made by those other than the investor "are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise." *SEC v. Glenn W. Turner Enterprises, Inc.,* 474 F.2d 476, 482 (9th Cir.1973). This element has been satisfied when a company manages, maintains, services and operates an investor-owned machine, even where the investor retained some illusory control over the investment. *Albanese v. Florida Nat'l Bank of Orlando,* 823 F.2d 408, 410 (11th Cir.1987) (investors purchased ice ma-

chine, leased it back to the company to service and maintain, and received a monthly return on investment); see also *SEC v. ETS Payphones, Inc.,* 123 F.Supp.2d 1349, 1353 (N.D.Ga.2000) (investors purchased pay telephones, leased back to company to service, maintain and collect revenue).

Despite contract provisions allowing the investors to choose another company to service their phones, or to service the phones themselves, ninety percent of investors chose Alpha as the service provider. Alpha chose the location of the phones without any input from the investors. Alpha serviced and maintained the phones, and the investors received a monthly return. Like the investors in *Howey* who had no particular expertise in cultivating citrus fruits, these investors had no expertise or interest in the operation of pay telephones. Alpha was ultimately responsible for "those essential managerial efforts which affect the failure or success of the enterprise," and the investors retained no control over the business.

### 2. Direct or Indirect Involvement

 Rubera contends that for the SEC to prevail, it must prove Rubera was " 'directly responsible' for the distribution of unregistered securities." However, Section 5 prohibits "any person, directly *or indirectly* " from selling or offering to sell an unregistered security. As the Seventh Circuit Court of Appeals has explained, "[t]o hold that proof of direct contact [with investors] is necessary would be to ignore and render meaningless the language of section 5, which prohibits any person from 'directly *or indirectly*' engaging in the offer or sale of unregistered securities, and would encourage violators to attempt to avoid liability by participating in all except the final steps of a planned offering." *SEC v. Holschuh,* 694 F.2d 130, 140 (7th Cir.1982) (emphasis in original). Liability has been imposed against defendants who

were the sole owners of entities necessary to the investment program, but who had little or no contact with the investors. *See e.g., SEC v. Friendly Power Co., LLC,* 49 F.Supp.2d 1363 (S.D.Fla.1999); *SEC v. Parkersburg Wireless LLC,* 991 F.Supp. 6, 9 (D.D.C.1997).

As the sole owner of Alpha, Rubera's involvement in the payphone program is sufficient to create liability. Although he did not have direct contact with the payphone program investors, ATC did have direct contact with the investors until 1999. After 1999, ATC's agent, SPA, had direct contact with the investors. For all intents and purposes, Rubera owned or controlled ATC at all material times and he was more than a mere fringe participant in the payphone program.

### B. Antifraud Provisions

 Section 17(a) of the Securities Act prohibits fraud in the offer and sale of securities. Similarly, Section 10(b) of the Securities Exchange Act, and Rule 10b–5, prohibit fraud in connection with the purchase or sale of any security. To establish primary liability under the antifraud provisions, the SEC must establish that a defendant intentionally or recklessly misrepresented or failed to disclose a material fact in connection with the sale or purchase of a security. *See Caravan Mobile Home Sales v. Lehman Bros. Kuhn Loeb,* 769 F.2d 561, 564 (9th Cir.1985) (citations omitted). A showing of scienter is required. *Aaron v. SEC,* 446 U.S. 680, 701–02, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980). Scienter refers to a "mental state embracing intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The SEC contends that Rubera made the following four major omissions or mis-

representations of material fact related to the payphone program:

(1) The payphone investment program was "low risk" and/or "safe";

(2) Alpha's operations of payphones were profitable, and the investor would receive a "guaranteed" or fixed annual return of 14%, paid on a monthly basis;

(3) The investment program provided a buy-back provision that allowed the investor to sell his or her payphone back to Alpha for the full purchase price after 36 months (or earlier, with a penalty); and

(4) The buy-back provision was fully insured.

The four representations listed above can be analyzed in two general categories: (1) representations about the financial condition of Alpha; and (2) representations about the payphone program provisions.

The SEC failed to meet its burden of proof in establishing the requisite degree of scienter with respect to Rubera. Rubera is not the sophisticated businessman one would expect to see at the helm of a large business. He hired his friends and relied on his attorneys to run the business and to ensure the business was operating within the bounds of the law. Payroll and overhead were bloated, and Rubera lived in Connecticut, not in Oregon where the corporate headquarters was located. Unfortunately, the combination of bad advice, poor management, and Rambach and Kennison's antics, brought Alpha to its knees.

### 1. Financial Condition of Alpha

 Rubera was involved in the decision to depart from GAAP on Alpha's financial statement, which could be construed as evidence that Rubera knew of Alpha's poor financial condition and intended to deceive others that Alpha's financial status was better than it actually was. However, that departure was reported on the books, and Rubera sought the advice of certified public accountants to help straighten out Alpha's records. Reporting the GAAP departure, and seeking advice from accountants is not consistent with an intent to defraud, manipulate or deceive anyone about the financial status of the company. Indeed, independent witnesses agreed that Rubera wanted an accurate picture of the financial condition of the company, and because his in-house accountants were perhaps not skilled in providing that picture, Rubera sought expert advice.

The Receiver has since recalculated and restructured the financial statements of Alpha to reflect losses. Those recalculations do not automatically show that Rubera knew Alpha was losing that much money on the payphone program. While Alpha did take a substantial loan from ATC, Alpha was faced with Rambach and Kennison's companies driving up buyback demands while at the same time procuring worthless sites to satisfy an ever increasing demand for new phone purchases. SPA and ATMN/EMI were wreaking havoc with Alpha's business, and the results of their interference do not lead to the conclusion that Rubera was acting with intent to deceive, manipulate or defraud.

### 2. Payphone Program Provisions

 Rubera did not authorize SPA salespersons to make guarantees to investors, and Rubera did not know that SPA was making guarantees. However, Rubera did make efforts to pay fourteen percent returns to investors, even if it meant reducing Alpha's own profits. That is not sufficient to show Rubera acted with intent to deceive, manipulate or defraud with respect to the returns.

Finally, Rubera did not act with intent to deceive, manipulate or defraud with respect to the buyback provision of the program or with respect to the buyback insur-

ance. Until ATMN/EMI created the backlog, Alpha was able to honor buyback requests. The backlog created by ATMN/EMI created dissatisfaction among investors, and a sharp increase in buyback demands. At the same time, SPA's attempts to churn buybacks in order to resell phones to the same investors added fuel to the fire. SPA benefitted from the commissions it received from the sale of insurance and new phones, but Alpha was taking a beating because it could not keep up with the sudden artificial buyback demand created by SPA, and the accompanying sudden artificial demand for new phones. In sum, the evidence is insufficient to establish Rubera acted with the requisite degree of scienter with respect to buybacks and buyback insurance. Rambach and Kennison created a mess that Rubera did not fully appreciate as it was happening.

### C. Relief Requested

The SEC seeks relief against Rubera in the form of a permanent injunction against future securities violations, disgorgement of ill-gained profits with interest, and third-tier civil penalties in the amount of his pecuniary gain. A permanent injunction and disgorgement are appropriate, but civil penalties will not be imposed against Rubera.

#### 1. Permanent Injunction

 Whether a permanent injunction should issue "rests within the sound discretion of the trial court." *SEC v. Goldfield Deep Mines Co.*, 758 F.2d 459, 465 (9th Cir.1985). To obtain a permanent injunction, the SEC must establish that there is "a reasonable likelihood of future violations of the securities laws." *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980). The key factor to consider is the past illegal conduct of the defendant. *United States v. Odessa Union Warehouse Coop.*, 833 F.2d 172, 176 (9th Cir.1987). The

following additional factors should be considered:

the degree of scienter involved; the isolated or recurrent nature of the infraction; the defendant's recognition of the wrongful nature of his conduct; the likelihood, because of the defendant's professional occupation, that future violations might occur; and the sincerity of his assurances against future violations.

*Murphy*, 626 F.2d at 655 (citations omitted). The fact that the illegal conduct has ceased does not foreclose injunctive relief. *Id.*

Prior to the payphone program, Rubera was not involved in the sale of securities. Rubera had a legitimate business installing and servicing payphones without the payphone program, and installing business systems. Accordingly, his profession does not necessarily put him at risk for committing future violations. However, the payphone program continued for several years before it was stopped, and the violations were recurrent rather than isolated. In addition, Rubera has failed to acknowledge wrongdoing or to make assurances that he will not commit future violations. To the extent that I have discretion to draw an adverse inference against Rubera for refusing to testify, I do so in this context only. *See SEC v. Colello*, 139 F.3d 674, 677–78 (9th Cir.1998) (the court may, but is not required to draw an adverse interest against a party based on his assertion of right to remain silent). Overall, the *Murphy* factors, coupled with the adverse inference, weigh in favor of issuing a permanent injunction against Rubera.

#### 2. Disgorgement

 The purpose of disgorgement is to prevent unjust enrichment. *Hateley v. SEC*, 8 F.3d 653, 655 (9th Cir.1993). To determine the amount of disgorgement, the SEC need only show "a reasonable

approximation of profits causally connected to the violation." *SEC v. First Pacific Bancorp*, 142 F.3d 1186, 1192 n. 6 (9th Cir.1998) (citations omitted).

The SEC has shown that Rubera received $3,750,707.66 in gross wages, shareholder compensation, shareholder loans, and other payments to Rubera and his family. That amount must be disgorged. The SEC contends that another $2,727,059.70 can be attributed to Rubera because that amount has been traced to undesignated payments of cash and payments to certain banks. However, these amounts have not sufficiently been tied to Rubera's own profit to warrant an order of disgorgement. Moreover, the amount Rubera is ordered to disgorge is sufficient to further the purposes of the securities laws. Accordingly, Rubera is ordered to disgorge profits in the amount of $3,750,707.66, plus prejudgment interest.

### 3. Civil Penalties

Third tier civil penalties are available when the securities law violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement [and] such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial loss to other persons." 15 U.S.C. §§ 77t (d)(2)(C), 78u (d)(3)(B)(iii). Like a permanent injunction, civil penalties are imposed to deter the wrongdoer from similar violations in the future; therefore the factors listed in *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980), apply.

Here, civil penalties are not warranted. This is the defendant's first violation, and it is my conclusion that his conduct did not amount to fraud, deceit, manipulation, or the like. Accordingly, disgorgement and a permanent injunction are sufficient remedies, and no civil penalties are imposed.

## CONCLUSION

Rubera violated Sections 5(a) and 5(c) of the Securities Act of 1933, but the SEC failed to prove Rubera had the requisite degree of scienter to establish violations of Section 17(a) of the Securities Act and Section 10(b) of the Securities Exchange Act, and Rule 10b–5 promulgated thereunder. A permanent injunction shall be entered against Rubera prohibiting further violations of Sections 5(a) and 5(c) of the Securities Act of 1933, and he is ordered to disgorge profits in the amount of $3,750,707.66, plus prejudgment interest. Plaintiff SEC shall submit a proposed Final Judgment of Permanent Injunction and Other Relief on or before February 19, 2002.